[No. B036100. Second Dist., Div. Seven. June 27, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
BILLY THOMPSON, Defendant and Appellant.

[No. B044511. Second Dist., Div. Seven. June 27, 1990.]

In re BILLY THOMPSON on Habeas Corpus.

COUNSEL

Ann Jory, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, Edward T. Fogel, Jr., Assistant Attorney General, Marc E. Turchin and Pamela C. Hamanaka, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

LILLIE, P. J.—Defendant appeals from judgment entered on a plea of guilty to possession for sale of cocaine (Health & Saf. Code, § 11351.5) and that it was a violation of section 1203.073, subdivision (b)(5) of the Penal Code, and to possession of phencyclidine (Health & Saf. Code, § 11377, subd. (a)).

## PROCEDURAL BACKGROUND

At the conclusion of the preliminary hearing, the prosecutor offered in evidence as exhibit one 21.5 grams of cocaine and 4 milliliters of phencyclidine (PCP). Defense counsel objected to their admission and moved to strike testimony relative to their being packaged for sale. The magistrate admitted the narcotics in evidence and denied the motion. The defense offered no evidence, and defendant was held to answer.

In superior court defendant moved to suppress the evidence under Penal Code section 1538.5. The court ruled that defendant's objection to the admission of exhibit 1 in municipal court constituted a 1538.5 motion; deemed the motion to suppress made in superior court to be a renewed 1538.5 motion which did not entitle defendant to an evidentiary hearing, and the evidence on the special hearing to be limited to a review of the transcript of the preliminary hearing and any evidence which reasonably could not have been presented at the preliminary hearing; held that, because the evidence could have been adduced at the preliminary hearing, defendant was not entitled at the special hearing to call witnesses to testify that he lived on the premises where he was arrested to show standing to challenge the search and seizure; and found defendant lacked standing to bring the motion and denied the motion on that ground after finding the officer had no right to enter the yard. Thereafter, defendant changed his plea to guilty as charged.

## STATEMENT OF FACTS

Three days before February 28, 1987, Officer Kiser received an anonymous tip from a prior arrestee who stated there was narcotics activity in the location of 1210 West C Street in Wilmington. In response thereto, and about 7:30 p.m. on February 28, Officer Kiser, with his partner Officer Ortiz, was proceeding eastbound in the rear alley of 1210 West C Street when he observed a Hispanic male in the rear yard of that address; Officer Kiser recognized the man from a prior arrest and knew he did not live at 1210 West C Street, but lived at the Dana Strand Housing Projects four blocks away; the man looked in Officer Kiser's direction and immediately stepped back as if to step away from them.

The officers exited the police car and "hopped over" a three-and a half-foot chain link fence into the rear yard to approach the man; Officer Ortiz detained him. When Officer Kiser was about 12 feet into the backyard, he saw to the left a chicken coop, 2 people in it and a flashlight beam coming from the coop; "[He] thought maybe burglars were back in the chicken coop," and walked around the rear garage to the chicken coop which had no rear door; he observed defendant and a female peering into a bag; they

did not see him approach until he was at the doorway of the chicken coop, then he illuminated the bag with his flashlight and saw defendant and the female seated, peering into what appeared to be a cloth bank bag held by defendant; Officer Kiser looked down on them, could see into the bag because it was lower than his head level, and observed a glass pipe which is commonly used to smoke cocaine. Officer Kiser grabbed defendant and brought him out of the chicken coop to detain him pending investigation, then recovered the bag with the glass pipe. The bag also contained a metal box in which were three or four more glass pipes and other paraphernalia for smoking cocaine. As Office Kiser began to make a cursory search of defendant for weapons, defendant made the spontaneous statement, "I have all the dope on me"; he then placed defendant under arrest. Officer Kiser found on him numerous film containers containing a substance resembling cocaine, and an additional clear glass vial containing a liquid which appeared to be PCP, then placed him in custody. In the officer's opinion the narcotics were possessed for sale. A chemical analysis showed 21.5 grams of cocaine and 4 milliliters of PCP.

### APPELLANT'S CONTENTIONS

Appellant argues error in the court's (1) ruling that he had made a 1538.5 motion before the magistrate and thus, was not entitled to an evidentiary hearing in superior court; (2) refusal to allow him to take evidence to establish that he had standing to challenge the search and seizure by offering testimony that the chicken coop was in the backyard of his own residence and, thus, he had a legitimate expectation of privacy in the chicken coop; (3) allowing the prosecutor to raise the issue of standing, he having waived it by not raising it at the preliminary hearing; and (4) denial of his 1538.5 motion, because it was error to permit the prosecutor to argue lack of standing, and lack of standing was the only reason given for the denial, the court having found that the officer had no right to go into the yard. He further contends that he was denied effective assistance of counsel because counsel at the preliminary hearing failed to present evidence that he resided on the premises on which the search and seizure took place which would have established his standing to renew the Penal Code section 1538.5 motion in superior court.

### I

### MOTION TO SUPPRESS WAS MADE AT PRELIMINARY HEARING

Appellant's argument that at the preliminary hearing he made no motion pursuant to Penal Code section 1538.5, because all he did was object to the admission in evidence of the narcotics, flies in the face of established authority.

When the prosecutor offered the narcotics in evidence at the preliminary hearing, defense counsel said: "I object to the introduction of those items into evidence, your Honor.

"I move to strike all testimony relative to the items being packaged for sale. The grounds are here, clearly here. There is no basis for any of these people to be detained. There was no basis to detain the first man, or for the officer to go over to the chicken coop.

"There was no evidence of criminal activity here prior to the observations that the officer says he made.

"I also believe that the patdown, which really is the basis for the spontaneous remarks to which the officer testified that the defendant made, I believe the patdown was unjustified. There was no indication or basis for that at this point.

"So I think there is a case at Lorenzana at 9 Cal.3d, which I recall is fairly similar to this.

". . . . . . . . . . . . . . . .

"MR. HORGAN: I think the initial entry was not proper, and anything that followed was not proper.

"THE COURT: Denied. People's 1 is admitted.

"MR. HORGAN: The motion is denied?

"THE COURT: Yes, sir."

■ "[T]he defendant need not follow strict procedures to bring a motion to suppress, but must make the basis for the motion clear, and must seek and obtain an unambiguous ruling on the motion." (*Anderson* v. *Superior Court* (1988) 206 Cal.App.3d 533, 542 [253 Cal.Rptr. 651]).
■ Although couched in terms of an objection to the evidence and a motion to strike, the foregoing establishes that, indeed, a motion to suppress under Penal Code section 1538.5 was made at the preliminary hearing. The traditional procedure of objecting to the admission of evidence to challenge the legality of a search and seizure has been held to constitute a motion under section 1538.5 (*People* v. *O'Brien* (1969) 71 Cal.2d 394, 403, fn. 5 [79 Cal.Rptr. 313, 456 P.2d 969]; *People* v. *Williams* (1970) 9 Cal.App.3d 565, 569-570 [88 Cal.Rptr. 349]), as has a motion to strike (*People* v. *Triggs* (1973) 8 Cal.3d 884, 887-888, fn. 2 [106 Cal.Rptr. 408, 506 P.2d 232]).

Based upon our review of the transcript of the preliminary hearing, we conclude that by putting in issue the legality of the initial entry to the premises, the detention of both men, and the patdown by way of objection to the admission in evidence of the items seized and a motion to strike testimony relative to their being packaged for sale, clearly stating his grounds therefor and seeking and obtaining a ruling by the court, defendant made a 1538.5 motion. The court properly deemed the motion before it to be a renewed 1538.5 motion.

## II

### No New Evidence Could Be Taken at Special Hearing

■ Having made a Penal Code section 1538.5 motion at the preliminary hearing, defendant was not entitled to an evidentiary hearing on his renewed motion at the special hearing in superior court and could take no evidence thereon, for the "evidence presented at the special hearing shall be limited to the transcript of the preliminary hearing and to evidence which could not reasonably have been presented at the preliminary hearing . . . ." (Pen. Code, § 1538.5, subd. (i); *Anderson* v. *Superior Court, supra,* 206 Cal.App.3d 533, 544; *People* v. *Ramsey* (1988) 203 Cal.App.3d 671, 679 [250 Cal.Rptr. 309].) Thus, defendant's offers to testify, or have his mother testify that he lived in the house on the premises where he was found in the chicken coop and arrested, were properly rejected by the court. Clearly, evidence that defendant lived on the premises could "reasonably have been presented at the preliminary hearing." (Pen. Code, § 1538.5 subd. (i).) As suggested by the court, defendant could have testified at the preliminary hearing that he lived in the residence but, as was his right, he elected not to do so thus, Officer Kiser (who, defense counsel conceded, knew where defendant lived) could have been cross-examined concerning defendant's residence, and other persons, i.e., defendant's mother (whom he produced at the special hearing), could have so testified at the preliminary hearing. The superior court did not err in refusing to take defendant's evidence to show standing. (Pen. Code, § 1538.5, subd. (i).)

## III

### Defendant Had Burden to Establish Standing

■ Under former California law, a defendant had standing to object to the introduction of evidence seized in violation of the rights of a third person. But article I, section 28, subdivision (d) of the California Constitution abrogated this vicarious exclusionary rule and a defendant's right to object to and suppress evidence seized in violation of the California, but not

the federal Constitution. (*In re Lance W.* (1985) 37 Cal.3d 873, 879 [210 Cal.Rptr. 631, 694 P.2d 744].) The federal rule is that only the defendant whose own constitutional rights were infringed has standing to challenge the legality of a search and seizure under the Fourth Amendment. Fourth Amendment rights are personal rights which may not be vicariously asserted. (*Rakas* v. *Illinois* (1978) 439 U.S. 128, 137 [58 L.Ed.2d 387, 397, 99 S.Ct. 421].) "Petitioner, of course, bears the burden of proving not only that the search of Cox's purse was illegal, but also that he had a legitimate expectation of privacy in that purse. See *Rakas* v. *Illinois, supra*, at 131, n.1, [58 L.Ed.2d 387, 99 S.Ct. 421; *Simmons* v. *United States*, 390 U.S 377, 389-390 (1968) [19 L.Ed.2d 1247, 88 S.Ct.967]." (*Rawlings* v. *Kentucky* (1980) 448 U.S. 98, 104 [65 L.Ed.2d 633, 100 S.Ct. 2556].)

"The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure. (*Rakas* v. *Illinois, supra*, 439 U.S. at p. 130, fn. 1 [58 L.Ed.2d at p. 393].) An illegal search only violates the rights of those who have a legitimate expectation of privacy in the invaded place. (*United States* v. *Salvucci* (1980) 448 U.S. 83, 91-92 [65 L.Ed.2d 619, 628, 100 S.Ct. 2547]; *Rakas* v. *Illinois, supra*, 439 U.S. 128, 140 [58 L.Ed.2d 387, 399].)" (*People* v. *Root* (1985) 172 Cal.App.3d 774, 778 [218 Cal.Rptr. 182].) " 'A defendant must also establish a legitimate expectation of privacy in the *particular area* searched in order for a Fourth Amendment challenge to be allowed.' " (*People* v. *Ooley* (1985) 169 Cal.App.3d 197, 203 [215 Cal.Rptr. 112], original italics.)

There is nothing in the transcript of the preliminary hearing to even suggest who, if anyone, lived on the premises at 1210 West C Street. Defendant wholly failed to establish his own Fourth Amendment rights were violated and that he had a reasonable expectation of privacy in the chicken coop which would have conferred on him standing to challenge the search and seizure.

Apparently recognizing that it was his burden to show standing and that the transcript of the preliminary hearing was completely barren of any such evidence, defendant, at the outset of the special hearing and at various times thereafter, beseeched the court, unsuccessfully, to allow him and later his mother, to testify that he lived in the residence and was arrested in his own backyard. Defendant failed to establish a legitimate expectation of privacy in the chicken coop.

IV

## PROSECUTOR DID NOT RAISE STANDING ISSUE AT SPECIAL HEARING AND DID NOT WAIVE RIGHT TO ARGUE THE ISSUE

■ Relying on *Steagald* v. *United States* (1981) 451 U.S. 204, 209 [68 L.Ed.2d 38, 43-44, 101 S.Ct. 1642] and *Rodriguez* v. *Superior Court* (1988) 199 Cal.App.3d 1453, 1461 [245 Cal.Rptr. 617], appellant contends the court erred in permitting the prosecutor to raise the issue of "standing" and argue the same at the special hearing because he waived the issue by not raising it in the municipal court.[1]

It is true, as brought out by the dissent, that "in oral argument before this court the People conceded the prosecution had waived the issue of Thompson's standing by not raising it at the time of the suppression hearing." However, even the dissent must acknowledge that, either through poor preparation, inadequate research or overzealous advocacy, the Attorney General is not always right, and we deem it to be an improvident concession on his part (see *People* v. *Vaughn* (1989) 209 Cal.App.3d 398, 401 [257 Cal.Rptr. 229]) by which we are not bound (*People* v. *Alvarado* (1982) 133 Cal.App.3d 1003, 1021 [184 Cal.Rptr. 483]) and which we do not accept (*People* v. *Cowger* (1988) 202 Cal.App.3d 1066, 1074 [249 Cal.Rptr. 240]) because he made no such concession in respondent's brief, in fact argued to the contrary, and for the reasons stated hereinbelow.

First, the record clearly establishes that it was defense counsel, not the prosecutor, who first raised the issue of standing at the special hearing. Second, appellant finds himself in the ludicrous position of urging the court's error in allowing the prosecutor to argue the issue of standing at the special hearing because he waived the issue by not having raised it in municipal court while, at the same time the record clearly shows that appellant failed to object to the prosecutor's argument on the standing issue at the special hearing thereby depriving the prosecutor of making a record on the matter and the court of making a ruling thereon and precluding the appellant from raising the issue on appeal. Defense counsel, having first raised the issue of standing at the special hearing, made various unsuccessful attempts to offer evidence of standing—that he lived in the house—then proceeded to argue the merits of his motion as though standing had been established. At various times defense counsel uttered his frustration, stating he was "annoyed," "it sticks in my craw," it is "disturbing" and is not

---

[1] In its cavalier treatment of standing, the dissent, at the outset, dismisses our discussion of the standing issue as dictum. While it may be dictum to the dissent, a careful and fair reading of our opinion can lead only to the conclusion that, indeed, the resolution of that issue is crucial to our disposition of this appeal.

"fair" for the prosecutor to bring up the point of standing when he knows full well defendant lived in the house and was arrested in his own backyard; but *not once* did defense counsel register a specific legal objection to the prosecutor's argument on the standing issue or even suggest that because the prosecutor had not raised it below, he could not argue the issue. Although appellant is precluded from raising the issue for the first time on this appeal (*People* v. *Belmontes* (1988) 45 Cal.3d 744, 766 [248 Cal.Rptr. 126, 755 P.2d 310]) for his failure to make a timely and specific objection and the point must be deemed waived (*People* v. *Green* (1980) 27 Cal.3d 1, 22 [164 Cal.Rptr. 1, 609 P.2d 468]), we discuss the contention because we think the issue should be put to rest. Third, the circumstances of this case do not lend themselves to an application of *Steagald.*

In *Steagald,* federal drug agents had an arrest warrant for one Lyons and entered petitioner's home to search for Lyons without a search warrant. They did not find Lyons but did find narcotics. Petitioner filed a suppression motion in district court; upon its denial he renewed it in the court of appeals which affirmed the district court. In the United States Supreme Court, the government for the first time argued that petitioner may lack an expectation of privacy in the house, an argument never made in the courts below. But *in addition,* in its brief in opposition to certiorari, the government represented to the Supreme Court "that the house in question was 'petitioner's residence' and was 'occupied by petitioner, Gaultney and Gaultney's wife.' " (451 U.S. at p. 209 [68 L.Ed.2d at p. 43].) Nevertheless, for the first time it contended the record failed to clearly show petitioner had a reasonable expectation of privacy in the house, and urged the Supreme Court to remand the case to the district court for reexamination of this factual question. Said the court, "The Government, however, *may* lose its right to raise factual issues of this sort before this Court when it has made contrary assertions in the courts below, when it has acquiesced in contrary findings by those courts, or when it has failed to raise such questions in a timely fashion during the litigation." (451 U.S. at p. 209 [68 L.Ed.2d at p. 441], italics added.) What did the government do? It failed to seek a correction of the magistrate's characterization in its report on petitioner's suppression motion, adopted by the district court and later affirmed by the Court of Appeals, that the issue was whether the arrest warrant was sufficient to justify the search of " 'the home of a third person' " for Lyons, but instead, acquiesced in the district court's view of petitioner's Fourth Amendment claim; it argued successfully during the trial and on appeal that petitioner's connection with the searched home was sufficient to establish his constructive possession of the cocaine found in a suitcase in the closet of the house; it failed to file a cross-petition for certiorari suggesting the case be remanded to the district court for further proceedings but, instead, argued further review was unnecessary; and in its opposition to certiorari expressly repre-

sented that the searched home was "petitioner's residence" and occupied by him. The court concluded "that the Government, through its assertions, concessions, and acquiescence, has lost its right to challenge petitioner's assertion that he possessed a legitimate expectation of privacy in the searched home." (451 U.S. at p. 211 [68 L.Ed.2d at p. 45].)

Our case is not *Steagald* nor, in our opinion, was *Rodriguez* v. *Superior Court, supra,* 199 Cal.App.3d 1453, in which the court relied on the above quoted passage from *Steagald.* (451 U.S. at p. 209 [68 L.Ed.2d at pp. 43-44].) When read in the context of the government's conduct in *Steagald,* it is clear that passage does not readily apply here.

Neither the prosecutor, the defense counsel, the magistrate nor the evidence taken at the preliminary hearing mentions who, if anyone, resided on the premises at 1210 West C Street on February 28, 1987. The burden was on defendant to show that he lived there and thus, had a legitimate expectation of privacy in the chicken coop, which burden he readily conceded by attempting, on various occasions, to offer evidence to make the proper showing of standing.

The first statement made by defense counsel at the special hearing raised the issue of standing for all time, "It is not a terribly complex case. It is a question of whether or not there was an invasion of privacy or probable cause to detain another individual, not this [defendant]." Only in response to this did the prosecutor then say, there "is the question of 'standing,' Your Honor. I have *just heard* that there is a contention that there was an illegal detention of someone else. . . . I will be arguing 'standing,' and that is under *In re Lance W.*" (Italics added.)

Appellant's position that, by failing to challenge standing at the preliminary hearing, the prosecution waived appellant's lack of standing, is mistaken. It was appellant who objected and moved for the suppression of evidence. "On the hearing the movant has the burden to support his motion by proof." (*People* v. *Carson* (1970) 4 Cal.App.3d 782, 785 [84 Cal.Rptr. 699] ["Absent any evidence whatsoever before the court, the defendant movant was not entitled to have his motion under section 1538.5 of the Penal Code granted." *Id.* at p. 787.].) Appellant had that "burden of proof as to each fact the existence . . . of which is essential to the claim for relief . . . ." (Evid. Code, § 500.) Essential to appellant's suppression motion or claim, was not merely proof that *someone's* Fourth Amendment rights had been violated or that a *particular* person's rights had been violated, but that *appellant's Fourth Amendment rights had been violated.* (*In re Lance W., supra,* 37 Cal.3d 873.) Thus in objecting, to the officer's backyard entry appellant, of necessity, claimed his "expectation of privacy in the invaded

place" [i.e., the backyard] had been violated. (*Rakas* v. *Illinois, supra,* 439 U.S. 128, 143 [58 L.Ed.2d 387, 400-401].) As the proponent of this claim appellant had "the burden of establishing his own Fourth Amendment rights were violated by the challenged search or seizure." (*People* v. *Ooley, supra,* 169 Cal.App.3d 197, 202; *Jones* v. *United States* (1960) 362 U.S. 257 [4 L.Ed.2d 697, 80 S.Ct. 725, 78 A.L.R.2d 233] ["Ordinarily, then, it is entirely proper to require of one who seeks to challenge the legality of a search as the basis for suppressing relevant evidence that he allege, and if the allegation be disputed that he establish, that he himself was the victim of an invasion of privacy." *Id.* at p. 261 (4 L.Ed.2d at p. 702).]; *Simmons* v. *United States* (1968) 390 U.S. 377, 389 [19 L.Ed.2d 1247, 1256, 88 S.Ct. 967].) By failing to offer evidence that he owned or leased or had some other comparable interest in the backyard appellant failed to establish his claim. (*Rakas* v. *Illinois, supra.*)

The prosecution "having prevailed below on the merits, cannot be faulted for not insisting upon an inquiry into yet another basis [i.e., lack of standing] upon which it might defeat the suppression motion." (4 LaFave, Search and Seizure, (2d ed. 1987) Appeal and Collateral Attack, § 11.7, subd. (d), p. 525; see also *U. S.* v. *Robertson* (9th Cir. 1987) 833 F.2d 777, 779 ["A defendant must show standing even if the Government has not pressed the issue in the district court."]; *U. S.* v. *Kinsey* (9th Cir. 1988) 843 F.2d 383, 390 ["Irrespective of the fact that the government did not raise the issue of standing prior to or during trial we find that [appellant] lacks standing to object [to warrantless arrest of codefendant.]"].)

Appellant's suppression motion, lacking evidence that his expectation of privacy had been violated, was fundamentally incomplete. It was not made whole by prosecutorial silence.

Further, in superior court, until defense counsel framed the issue— "whether or not there was an invasion of privacy"—the prosecutor did not mention standing, and when he did and argued the same, defense counsel made no objection thereto, although near the conclusion of his argument he expressed his aggravation that the prosecutor would argue the issue when he knew defendant lived in the house. But none of defense counsel's comments rose to the level of a legal objection on the specific ground he now urges.[2]

---

[2] Defense counsel commented he was "annoyed" "that that particular point is brought up," "and it is not part of the transcript, it is not part of the record—but, there is such a thing as fairness and that is where the [defendant] lives and that just kind of sticks in my craw a little bit." Reminded by the court that at the preliminary hearing defense counsel "never even said this was his house," defense counsel responded, "I would find it extremely disturbing that the district attorney can stand up and argue the point of 'standing' when it is clear from every re-

Even though the transcript contained no evidence concerning who lived on the premises, and defense counsel was thwarted in his efforts to introduce evidence on the issue of standing, he nevertheless interspersed his arguments with such as, "a man has a right to privacy in his own chicken coop"; "there is no law against an individual being in his own chicken coop, daytime or nighttime, with or without a girl"; important are "the expectations that one has with regard to his own privacy and not only in his home but, I think, in its environs." Under such circumstances, does the law preclude the prosecutor from responding to these statements? We think not. And he did respond, "[C]ounsel was talking about privacy and the detention—what he characterized as illegal detention of someone else, and we have not reached that issue. Nor, on this record, which [sic] way the court is bound by, have we even established anything about Mr. Thompson's standing from this record, as I read it, Your Honor. . . . [¶] I didn't see anything about him living in that backyard chicken coop"; and the court responded, "Neither have I. And I haven't seen anything about him living at that house."

The court found "the officer had no right to go into the yard," then said, "The next question then becomes: does Mr. Thompson have standing to argue that [the officer] should not be in the backyard . . . ." Defense counsel countered there is no proof defendant does not have standing, the burden is on the prosecution to show defendant had no business in the yard, and "the logical inference is that he is in his own chicken coop." But the court strongly disagreed saying there was no such inference, and held it was defendant's burden to show he had the right to be there.[3] Then defense counsel made the astounding statement that inasmuch as he had the burden of showing standing, he now had good cause to call defendant's mother to testify he lived in the residence, because "this issue of 'standing' that would be raised by the prosecutor, that he had no right to be there, [was] totally unanticipated and surprise. It is a surprise to the defense." The request to call the witness was properly denied. First, it was defense counsel who first raised "this issue of 'standing,' " not the prosecutor. Second, the prosecutor at no time said defendant "had no right to be there," maintaining always

port and all the knowledge that he and I have about this case, about who lived there. It is not in the transcript, and I grant that, but—" The court reminded defense counsel that "falling back on technicalities in these cases is not something peculiar to the prosecution, in the least. [¶] That is the way the game is sometimes played, the prosecution insists on certain technicalities and the defense insists on every technicality." And, of course, on this appeal, appellant urges a technicality for the reversal of the judgment even though he has admitted his guilt by pleading guilty to the charges.

[3] At this point the defense again asked the court to receive evidence of standing; the court said "No, because we are bound by the record. There is nothing new about this case. There is nothing that has come up that would indicate to me that [defendant] couldn't do it at the preliminary hearing. He chose not to do it at the preliminary hearing."

that there is nothing in the record to show who lived there. Third, defendant was not entitled to an evidentiary hearing. Finally, one wonders why defendant opened the special hearing on his motion with a request to testify he lived in the residence, if the issue of standing was so "unanticipated" and was such a "surprise."

Although both parties argued the standing issue, the judge commented intermittently that he was "troubled" by defendant's lack of standing, was "concerned" about the standing issue, and the standing problem "bothers me." In light of the careful and scholarly way in which the judge approached the motion, and his comments on the evidence taken at the preliminary hearing, both parties delude themselves if they entertain any thought that the judge would not have noted defendant's lack of standing without it having been called to his attention. There is nothing to prevent a court alone from raising the issue. (See *People* v. *Dasilva* (1989) 207 Cal.App.3d 43, 47 [254 Cal.Rptr. 563].)

V

EFFECTIVENESS OF COUNSEL

On the day appellant filed his opening brief, he also filed a petition for writ of habeas corpus alleging ineffective assistance of counsel. This court ordered the petition to be considered with the appeal because, on both, appellant contends that his counsel was ineffective at the preliminary hearing for his failure to introduce evidence that he lived on the premises searched in order to establish his standing to bring a suppression motion.

In his petition for habeas corpus, as on this appeal, appellant argues that the "complete lack of evidence of his standing to bring a suppression motion was the sole reason his motion pursuant to Penal Code section 1538.5 in superior court was denied. . . . This failure deprived [him] of the adjudication of a potentially meritorious defense." He presents declarations establishing that he and his mother lived at the premises on West C Street; that at the time of the preliminary hearing his attorney was not aware of the change in Penal Code section 1538.5, subdivision (i), which change "provided that a defendant such as Billy Thompson would not generally be able to have a full evidentiary hearing (de novo) later in the Superior Court if a Penal Code section 1538.5 motion was brought in the Municipal Court"; had the attorney realized this situation, "and if it were in the client's best interests at the time, [he] would have introduced all facts at the preliminary hearing which would have established standing. . . ."

For appellant to prevail on his claim of ineffectiveness of counsel, he must show that had standing been established, his motion to suppress would have

had merit. (See *People* v. *Grant* (1988) 45 Cal.3d 829, 864-865 [248 Cal.Rptr. 444, 755 P.2d 894]; *People* v. *Boyde* (1988) 46 Cal.3d 212, 255-256 [250 Cal.Rptr. 83, 758 P.2d 25].) ▮ ▬ ▬ ▮ ▬ We conclude, assuming standing, his motion to suppress was without merit.[4] Inasmuch as our review of the merits of the motion reveals no error occurred in its denial, appellant's claim of ineffectiveness of counsel is unavailing. (See *People* v. *Boyde, supra,* 46 Cal.3d at p. 255.)

▮ Where a motion to suppress is submitted to the superior court on the preliminary hearing transcript, the appellate court disregards the findings of the superior court and reviews the determination of the magistrate who ruled on the motion to suppress, drawing all presumptions in favor of the factual determinations of the magistrate, upholding the magistrate's express or implied findings if they are supported by substantial evidence, and measuring the facts as found by the trier against the constitutional standard of reasonableness. (*People* v. *Ramsey, supra,* 203 Cal.App.3d 671, 678-679 [250 Cal.Rptr. 309].)

▮ Officer Kiser testified at the preliminary hearing that he saw a man in a backyard in the evening when it was dark; the officer recognized the man from a prior arrest and knew he did not live there, but four blocks away; the man looked in the officers' direction and immediately stepped back as if to step away from them. The purpose of his detention was for the officers to find out "what he was in that rear yard for . . . . We knew he did not live there."

The magistrate expressly found that the officer believed the man to be engaged in the criminal activity of trespass. In light of the superior court's statement that it did not think the officer had a right to go into the yard, it appears that the superior court made factual findings contrary to those of

---

[4] Although the superior court found "the officer had no right to go into the yard," and denied the motion on lack of standing, we believe the superior court was in error on the merits. Appellant is not entitled to an erroneous ruling and cannot claim prejudice on account of it. Moreover, "if the action of the trial court in denying the motion to suppress was right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion. A correct decision of the trial court must be affirmed on appeal even if it is based on erroneous reasons." (*People* v. *Hobbs* (1987) 192 Cal.App.3d 959, 963 [237 Cal.Rptr. 742].)

Significantly, the magistrate either bypassed the standing issue or assumed standing and ruled correctly that the officer's entry onto the property was proper: "I guess the gist is they find somebody whom they know has a prior arrest within the confines of private property, and he does not live within that private property. [¶] Mr. Horgan [defense counsel]: What did it show? There was nothing found to show that the man found was involved in criminal activity. [¶] The Court: Except he was in violation of 602, trespass. [¶] Mr. Horgan: How did he know that he wasn't a guest? [¶] The Court: He couldn't find that out without detaining. . . ."

the magistrate. **(10)** As the superior court "is no longer vested with unrestricted power to determine the facts," (*People* v. *Ramsey, supra,* 203 Cal.App.3d at p. 679), but is bound by the magistrate's factual findings which are supported by substantial evidence, we disregard the findings of the superior court and review the determination of the magistrate.

■ We conclude that substantial evidence supports the magistrate's findings that the police officer articulated a reasonable suspicion that the male Hispanic "ha[d] committed or is about to commit [the] crime" of trespass (*Florida* v. *Royer* (1983) 460 U.S. 491, 498 [75 L.Ed.2d 229, 237, 103 S.Ct. 1319]), and that the purpose of the officers in going onto the premises was to detain the man.[5] Accordingly, the issue before us is whether entry by the police on appellant's property to detain a third party, as to whom they have a reasonable suspicion of criminal activity, *unreasonably* invaded appellant's legitimate expectation of privacy in his backyard. (See *People* v. *Mayoff* (1986) 42 Cal.3d 1302, 1310 [233 Cal.Rptr. 2, 729 P.2d 166].) Several cases bear on the issue and provide some parameters for analysis, but are not dispositive.

■ As to entries *into dwellings,* the United States Supreme Court has established that absent exigent circumstances or consent, an entry into one person's private dwelling to conduct a search for, or effect an arrest of, a third person, even with an arrest warrant for the third person, is unreasonable, absent a search warrant for the dwelling. (*Steagald* v. *United States, supra,* 451 U.S. 204, 212-216 [68 L.Ed.2d 38, 45-48, 101 S.Ct. 1642].)

" 'In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.' " (*Steagald, supra,* 451 U.S. at p. 212 [68 L.Ed.2d at p. 45], citing *Payton* v. *New York* (1980) 445 U.S. 573, 590 [63 L.Ed.2d 639, 653 100 S.Ct. 1371].)

■ In the instant case, it is clear that the backyard was part of the curtilage of the residence, and was thus, within the scope of Fourth Amendment protections. (*Oliver* v. *United States* (1984) 466 U.S. 170, 180 [80 L.Ed.2d 214, 225, 104 S.Ct. 1735].) It was not necessary for the court in *Oliver,* as it is here, to "consider the scope of the curtilage exception to the open fields doctrine or the *degree* of Fourth Amendment protection

---

[5] We believe the dissent to apply an improper standard of review, totally ignoring the magistrate's finding that the officer reasonably believed the Hispanic male to be committing the crime of trespass. Moreover, the dissent improperly characterizes the record as showing merely a belief on the officer's part that the Hispanic male did not live there; the officer testified that he *knew* the man did not live there, but lived four blocks away.

afforded the curtilage, as opposed to the home itself." (*Id.*, at p. 180, fn. 11 [80 L.Ed.2d at p. 225].)

■ As to the curtilage, "[the California] Supreme Court has made clear that a police officer who makes an uninvited entry onto private property does not per se violate the occupant's Fourth Amendment right of privacy. The criterion to be applied is whether entry is made into an area where the public has been implicitly invited, such as the area furnishing normal access to the house. A reasonable expectation of privacy does not exist in such areas. (*Lorenzana* v. *Superior Court* (1973) 9 Cal.3d 626 . . . .)" (*In re Gregory S.* (1980) 112 Cal.App.3d 764, 775 [169 Cal.Rptr. 540].)

■ In the case of a warrantless police entry onto private property to arrest or detain, the inquiry is whether the entry violates a reasonable expectation of privacy. (*In re Gregory S., supra,* 112 Cal.App.3d 764, 775.) " '[T]he test of reasonableness is dependent upon the totality of facts and circumstances involved in the context of each case [citations] and does not turn merely upon whether a physical trespass is manifested [citations].' " (*Id.* at p. 775.)

"In California, the legality of a warrantless police intrusion into allegedly private zones of activity depends on whether the government has 'unreasonably' invaded an actual expectation of privacy which society is prepared to recognize as reasonable. [Citations.] . . . [¶] . . . The inquiry whether particular privacy expectations are 'reasonable,' and whether government has intruded upon them 'unreasonably,' involves a weighing of the competing privacy and law enforcement interests." (*People* v. *Mayoff, supra,* 42 Cal.3d 1302, 1310, 1317.)[6]

In *Gregory S.,* a police officer, who had received a complaint of malicious mischief from appellant's neighbor, saw appellant and his brother in the

---

[6] *United States* v. *Pace* (7th Cir. 1990) 898 F.2d 1218, discussed in the dissent, affirms the balancing test set out in *In re Gregory S., supra,* 112 Cal.App.3d 764, 775, and *People* v. *Mayoff, supra,* 42 Cal.3d 1302, 1310, 1317. The court in *Pace* held that "Balancing the need for Patton's [the officer's] action (to investigate a possible threat to Savides' life) against the intrusion on Wilson's [defendant's] privacy (a brief detention, in a garage, to allay his suspicions), along with the circumstances surrounding that intrusion, see *id.* at 21, 88 S.Ct. at 1879; *Long,* 463 U.S. at 1046, 103 S.Ct. at 3479, we conclude that Patton's entry into the garage was reasonable and thus did not violate the Fourth Amendment." (898 F.2d at p. 1229.)

The dissent incorrectly characterizes *Pace* as based on the exigent circumstances exception to the warrant requirement. That theory is not expressly or by implication invoked in *Pace.* Indeed, it would be difficult to conclude that facts possessed by a police officer meeting only the standard of reasonable suspicion of criminal activity could meet the difficult standard of the exigent circumstances doctrine, that the facts show an *imminent* and *serious* peril to life.

*Pace,* however, does destroy the claim by the dissent that "absent exigent circumstances, a reasonable suspicion is not enough to justify jumping over a fence into someone's backyard . . . ." In *Pace,* a reasonable suspicion the defendant was an assassin was found to be sufficient to justify an investigative stop in the defendant's garage.

front yard of their house; the officer called to appellant to "Come here," but he ignored the officer and walked around the side of the house; the officer walked about 20 feet up the driveway to appellant's brother and asked him where appellant had gone and the brother said he did not know; appellant then appeared and told the officer to get off the property; the officer told him he was investigating a neighbor's complaint and said he wanted to talk to him; appellant said he did not have to talk to the officer and began to leave; the officer took appellant by the arm and a struggle ensued. The court concluded that "The officer entered and contacted appellant on the driveway approximately 20 feet from the street. This location was not one in which a right of privacy would normally exist." (112 Cal.App.3d at p. 775.)

The court in *Gregory S.* also rejected the appellant's argument that any implied invitation was revoked and his right to privacy was invoked when he ordered the officer off the property: "But the officer had the right and commensurate duty to deal with the problem at hand. He did not enter the property arbitrarily. . . . [T]he entry and detention were authorized by the public concern to maintain peace in the neighborhood. The constitutionality of police intrusions is determined by weighing 'the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.' " (112 Cal.App.3d at p. 776.)

▮ "The presence of an officer within the curtilage of a residence does not automatically amount to an unconstitutional invasion of privacy. Rather, it must be determined under the facts of each case just how private the particular observation point actually was. It is clear that police with legitimate business may enter areas of the curtilage which are impliedly open, such as access routes to the house. In so doing they are free to keep their eyes open. [Citation.] An officer is permitted the same license to intrude as a reasonably respectful citizen. [Citation.] However, a substantial and unreasonable departure from such an area, or a particularly intrusive method of viewing, will exceed the scope of the implied invitation and intrude upon a constitutionally protected expectation of privacy. [¶] What is reasonable cannot be determined by a fixed formula. It must be based on the facts and circumstances of each case. [Citation.]" (*State v. Seagull* (1981) 95 Wn.2d 898 [632 P.2d 44, 47], fn. omitted.)

In *Seagull,* a police officer, canvassing the neighborhood for information about an abandoned vehicle with blood stains, knocked on the door of a house and received no answer; while walking through the yard to another entrance, the officer strayed slightly from the most direct route and walked within six to ten feet of outbuildings and a greenhouse, wherein he saw what he believed to be marijuana. The court concluded the officer's actions did

not intrude upon a privacy expectation deserving of Fourth Amendment protection. (632 P.2d at p. 49.)

Another court characterized *Seagull* as based on the following factors: "(1) [The officer] did not spy into a residence; (2) his route was a normal one, considering his purpose; (3) he was not secretive, but acted openly in an honest attempt to talk with the occupants; (4) he did not get as close as he could have, but kept his distance; (5) the discovery was accidental; (6) he did not create an artificial vantage point; (7) the acts occurred in daylight; and (8) he strayed only slightly from the most absolutely direct route necessary to conduct his 'legitimate police business.'" (*State* v. *Vonhof* (1988) 51 Wn.App. 33, 39 [751 P.2d 1221, 1225].)

 Although in the instant case the officers may have entered appellant's property by way of an area that was not a "normal route of access for anyone visiting the premises," (*State* v. *Cloutier* (Me. 1988) 544 A.2d 1277, 1279-1280), we conclude that the intrusion was not a substantial and unreasonable departure from a normal route of access when balanced against the public concern for the prevention of crime and the concern to maintain peace and security in the neighborhood, not to mention appellant's own interest in the security of his residence.[7]

It is appellant's own interest in the security of his residence and society's interest in prevention of crime which gave the police "legitimate business" with respect to the possible trespasser in appellant's backyard and which thus, distinguishes this case from *People* v. *Winters* (1983) 149 Cal.App.3d 705 [196 Cal.Rptr. 918], cited by appellant.

In *Winters,* police were found to be on legitimate police business when they approached Winters's front door to talk to his son about a malicious mischief matter. However, rather than knocking on the door, which would have confirmed that no one was home, the officers "breached the privacy of the rear of the house, went through the closed posted [Private Property/no trespassing/no soliciting] gate, and eventually found some growing marijuana plants." (149 Cal.App.3d at p. 707.) The court held the entry to the backyard to be unconstitutional: "The officers could have determined *at the front door* no one was at home. Once this determination was made, their

---

[7] We are perplexed by the dissent's emphasis on the issue of the *manner* of police entry by jumping over a three-and a half-foot chainlink fence in Thompson's backyard. The existence of a fence might be significant in defining the curtilage, by definition the area within the scope of Fourth Amendment protection; but here it is conceded that the entry was onto "curtilage." The issue of the legality of such entry is the same whether the fence was three or six feet high, or there was no fence at all. The existence or nonexistence of a fence bears little on the balancing of the competing law enforcement and private interests at stake.

official business at Winters' home ended. By trespassing into the backyard, they surpassed what was reasonable under the circumstances, for no exigency existed to justify a suspension of Winters' Fourth Amendment rights." (149 Cal.App.3d at p. 708, original italics.)

In the instant case, the officers' legitimate police business was with the Hispanic man in the backyard; at the time they entered the yard, they were not interested in activities or persons inside the residence. As their entry onto the premises was not for the purpose of spying into a residence, their conduct is clearly distinguishable from that in *Lorenzana* v. *Superior Court* (1973) 9 Cal.3d 626 [108 Cal.Rptr. 585, 511 P.2d 33]. Further, the discovery of the contraband was accidental in that the officers did not go onto the premises with the purpose of searching the chicken coop. (See, e.g., *State* v. *Seagull, supra,* 632 P.2d at pp. 48-49.) There is also no evidence that the officers created an artificial vantage point from which to further observe activities on the premises.

The police would have an unreasonably difficult time protecting citizens and their property from the criminal actions of third parties if police were restricted to walkways, driveways, and other normal access routes when the third parties whom the officers seek to detain do not restrict themselves to such areas.

Under these circumstances, "we cannot say the limited deviation, within the open area, that occurred in this case was so unreasonable as to be an intrusion upon a privacy expectation deserving of Fourth Amendment protection under *Katz* v. *United States* [(1967) 389 U.S. 347 (19 L.Ed.2d 576, 88 S.Ct. 507)]." (*State* v. *Seagull, supra,* 632 P.2d at p. 49.)

The fact that the officers had other options in dealing with the male Hispanic does not make their intrusion onto appellant's backyard unreasonable. The officers could have stood in the alley and could have attempted to detain the male Hispanic from that point, or they could have gone to the front door of the residence to ask those inside about the Hispanic's presence. However, the latter likely would have intruded more into the privacy of the occupants of the premises. And the option of calling to the man from the alley well may have resulted in his flight either into the street before he could have been apprehended or through other areas of the premises which also would have increased the intrusion upon appellant's privacy interests. Given the alternative courses of police action, the actual conduct of the police seems to be the least intrusive means of investigating the man's presence upon appellant's property. We conclude the officers' entry onto appellant's property did not constitute an unconstitutional invasion of privacy.

Although appellant appears to focus on the issue of the officers' initial entry onto his backyard, we also conclude that Officer Kiser's subsequent conduct leading to the seizure of the drugs was also proper under the Fourth Amendment. As the initial entry did not violate appellant's rights under the Fourth Amendment, Officer Kiser had a right to be where he was when he saw two people with a flashlight in the chicken coop, whom he thought to be burglars. Such observations were not a "search" in the constitutional sense. (*People* v. *Campobasso* (1989) 211 Cal.App.3d 1480, 1483 [260 Cal.Rptr. 202].) For the same reasons which make the initial entry onto the property constitutionally proper, Kiser's actions in going over to the chicken coop to investigate further were also proper. Thus, the officer had a right to be where he was when he observed the drug paraphernalia, providing grounds to detain appellant, which detention soon ripened into an arrest. A proper search incident to that arrest resulted in the discovery of the drugs sought to be suppressed.

■ As the motion to suppress was, and is, without merit, so also without merit is appellant's claim of ineffectiveness of counsel with respect to such motion.

### DISPOSITION

The judgment is affirmed and the petition for writ of habeas corpus is denied.

Woods (Fred), J., concurred.

**JOHNSON, J.**—I respectfully dissent. I would hold the police officers' warrantless invasion of appellant's backyard was not reasonable under the circumstances and, therefore, the evidence they discovered in the chicken coop should have been suppressed. Furthermore, although the discussion of waiver of the standing issue appears to be dictum, (maj. opn., *ante*, at pp. 934-935), I believe it is necessary to explain why, in my view, the People waived the issue of standing by not raising it at the suppression hearing.[1]

---

[1] Ironically, in arguments before this court and the United States Supreme Court, the People conceded the very points the majority finds meritorious in the case at bench. In oral argument before this court the People conceded the prosecution had waived the issue of appellant's standing by not raising it at the time of the suppression hearing. And, in a recent argument before the United States Supreme Court, the People conceded, "The curtilage doctrine protects against warrantless physical intrusions into the home. . . . *A person may reasonably expect that an officer will not jump a fence . . . .*" (Citing *California* v. *Ciraolo* (1986) 476 U.S. 207 [90 L.Ed.2d 210, 106 S.Ct. 1809] (italics added).) Yet, this is exactly what the officers did in the case before us. Unlike the majority, I see no reason to criticize the People's

Whether dictum or not, it would be extremely unfortunate if other courts followed the majority's resolution of this issue.

## I. THE EVIDENCE SEIZED FROM DEFENDANT IS INADMISSIBLE BECAUSE IT WAS OBSERVED FROM A LOCATION THE POLICE HAD NO RIGHT TO BE.

The legality of the search and seizure in this case depends on whether the officers' entry into appellant's backyard was lawful.

Once the officer reached the chicken coop and shined his light into it, appellant and the narcotics paraphernalia came into "plain view." However, before the prosecution can invoke the "plain view" doctrine it must establish the officer had the right to be at the location where he could observe the contraband. As our Supreme Court stated in *Lorenzana* v. *Superior Court* (1973) 9 Cal.3d 626, 634 [108 Cal.Rptr. 585, 511 P.2d 33]: "[O]bservations of things in plain sight made from a place where a police officer has a right to be do not amount to a search in the constitutional sense. On the other hand, when observations are made from a position to which the officer has not been expressly or implicitly invited, the intrusion is unlawful unless executed pursuant to a warrant or one of the established exceptions to the warrant requirement."

*Lorenzana* is consistent with the federal rule holding illegal entries vitiate subsequent searches or seizures, even if the contraband is in plain view after the entry. (*Coolidge* v. *New Hampshire* (1971) 403 U.S. 443, 464-466 [29 L.Ed.2d 564, 581-583, 91 S.Ct. 2022] (plur. opn.); *Maryland* v. *Buie* (1990) 494 U.S. 325 [108 L.Ed.2d 276, 110 S.Ct. 1093].) The rule was most recently stated by our Supreme Court in *People* v. *Bittaker* (1989) 48 Cal.3d 1046, 1975 [259 Cal.Rptr. 630, 774 P.2d 659]: "[S]eizure of any object in plain view which is itself evidence of a crime is legal . . . *provided* the arresting officer views it from a position in which he has a legal right to be." (Italics added.)

In *Lorenzana,* a police officer received a tip from a reliable informant that Lorenzana was selling narcotics from his home. Without attempting to obtain a warrant, the officer went to the address the informant gave him. The officer walked down a driveway adjacent to Lorenzana's residence then went onto Lorenzana's property and peered through a gap in a curtained window into Lorenzana's residence. The officer stood an inch from the window and observed Lorenzana's activities inside. When he had seen

representative for adopting these perfectly reasonable positions rather than mindlessly opposing every position which might help protect our citizens' constitutional rights.

enough to conclude Lorenzana was dealing heroin, the officer and his partner forced entry into the house and arrested Lorenzana. (9 Cal.3d at pp. 629-631.)

The Supreme Court held the evidence obtained as a result of the officer's peering into Lorenzana's home could not be used at his trial. The court found a critical distinction between observations of activities on private property made from a vantage point where the officer had a right to be, such as property in public common use, and observations made from a vantage point where the officer had no right to be, such as a portion of defendant's yard not open to the public. (9 Cal.3d at pp. 632-635.) In the latter situation, evidence obtained from the officer's observations is inadmissible. (*Ibid.*)

The court, in *Lorenzana,* noted a number of circumstances which would allow an officer to intrude onto a person's private property. Obviously he may go onto the property under color of a valid arrest or search warrant. Or, he may be explicitly or implicitly invited onto the property. Or, he may be acting under an established exception to the warrant requirement. (9 Cal.3d at p. 634.)

In the present case it is undisputed the police could not have discovered appellant in possession of narcotics without going into the backyard of the residence. Neither appellant, the chicken coop nor the narcotics could be seen from the public alley that bordered appellant's backyard. This is not a case where the defendant exposed the goings-on in his yard to view from the street or the air. Nor is this a case where the police could claim they were implicitly invited onto the premises by an ungated path, an open driveway or the like. Thus none of the cases cited by the majority are relevant in deciding the case before us. (Cf. *People* v. *Mayoff* (1986) 42 Cal.3d 1302; *In re Gregory S.* (1980) 112 Cal.App.3d [169 Cal.Rptr. 540]764; *State* v. *Seagull* (1981) 95 Wn.2d 898 [632 P.2d 44].)

The undisputed evidence shows the police parked in the alley behind appellant's home and leaped over a three and a half-foot chain link fence to get into appellant's backyard. Even the majority concedes this "was not a 'normal route of access for anyone visiting the premises'." (Maj. opn., *ante*, at p. 944.)

In my view, the warrantless intrusion into the backyard of a suburban residence which has been fenced off from public access is the near equivalent of an intrusion into the home itself.

As a general rule, a police officer has no right to make a warrantless entry into a home or its curtilage. The curtilage is the area "immediately sur-

rounding and associated with the home . . . to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life,' . . ." (*Oliver* v. *United States* (1984) 466 U.S. 170, 180 [80 L.Ed.2d 214, 225, 104 S.Ct. 1735] [citation omitted].) The state's invasion of the curtilage of one's home is as opprobrious as invasion of the home itself. "The protection afforded the curtilage is essentially a protection of families and personal privacy in an area intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened." (*California* v. *Ciraolo, supra*, 476 U.S. at pp. 212-213 [90 L.Ed.2d at p. 216].) Thus, "the curtilage doctrine evolved to protect much the same kind of privacy as that covering the interior of a structure . . . ." (*Dow Chemical Co.* v. *United States* (1986) 476 U.S. 227, 235 [90 L.Ed.2d 226, 235-236, 106 S.Ct. 1819]) and the curtilage "has been considered part of the home itself for Fourth Amendment purposes." (*Oliver* v. *United States, supra*, 466 U.S. at p. 180 [80 L.Ed.2d at p. 225].) As these decisions demonstrate, the expectation of privacy in the curtilage around one's home is a priori reasonable, (see *Katz* v. *United States* (1967) 389 U.S. 347, 360 [19 L.Ed.2d 576, 587, 88 S.Ct. 507] (Harlan, J., conc.).), and a warrantless intrusion into that area is unlawful unless it falls under one of the recognized exceptions to the warrant requirement discussed above.

The case before us does not call for a resolution of the outer perimeters of a curtilage subject to a reasonable expectation of privacy. The police officers in this case did not enter appellant's front yard, (cf. *In re Gregory S., supra*, 112 Cal.App.3d at p. 775), or walk up his driveway (cf. *People* v. *Bradley* (1969) 1 Cal.3d 80, 83 [81 Cal.Rptr. 457, 460 P.2d 129]). A suburban backyard surrounded by a three and a half-foot chain link fence is the very essence of the curtilage in which a homeowner is entitled to an expectation of privacy. (See *California* v. *Ciraolo, supra*, 476 U.S. at p. 213 [90 L.Ed.2d at pp. 216-217]; *Taylor* v. *United States* (1932) 286 U.S. 1, 5 [76 L.Ed. 951, 953, 52 S.Ct. 466]; *People* v. *Mayoff, supra*, 42 Cal.3d 1302, 1317 [233 Cal.Rptr. 2, 729 P.2d 166]; *People* v. *Roberts* (1987) 195 Cal.App.3d 479, 482 [240 Cal.Rptr. 658]; *People* v. *Winters* (1983) 149 Cal.App.3d 705, 707 [196 Cal.Rptr. 918].) The fence is itself a declaration the resident expects to enjoy privacy in this area of the property. Beyond any doubt, and by any test, appellant had a reasonable expectation of privacy in his backyard.

The majority, while conceding appellant had a reasonable expectation of privacy in his backyard (maj. opn., *ante*, at p. 941), nevertheless hold the warrantless intrusion into appellant's backyard was reasonable because the officers had a "reasonable suspicion" the unidentified man had committed, or was about to commit, a crime. (Maj. opn., *ante*, at p. 941.) (See *Terry* v. *Ohio* (1968) 392 U.S. 1 [20 L.Ed.2d 889, 88 S.Ct. 1868]; *In re Tony C.* (1978) 21 Cal.3d 888 [148 Cal.Rptr. 366, 582 P.2d 957].)

The circumstances which may justify a police officer stopping and detaining a person for questioning or other limited investigation were set out by our Supreme Court in *In re Tony C.*: "[I]n order to justify an investigative stop or detention the circumstances known or apparent to the officer must include specific and articulable facts causing him to suspect that (1) some activity relating to crime has taken place or is occurring or is about to occur, and (2) the person he intends to stop or detain is involved in that activity." (21 Cal.3d at p. 893; and see *Terry* v. *Ohio, supra,* 392 U.S. at pp. 20-22 [20 L.Ed.2d at pp. 905-907].)

While the police may stop and question a person on the *street* without an arrest or search warrant, (*Terry* v. *Ohio, supra,* 392 U.S. at p. 22 [20 L.Ed.2d at pp. 906-907]; *In re Tony C., supra,* 21 Cal.3d at p. 893), it is a far different matter to permit the police to make a warrantless entry into a residence or the private portion of its curtilage when the sole justification is the reasonable suspicion that supports a detention under *Terry* and *Tony C.* Our Supreme Court has not addressed this issue directly, but it has given every indication it would not approve a warrantless search of the private areas of a home based merely on "reasonable suspicion."

For example, in *People* v. *Williams* (1988) 45 Cal.3d 1268, 1297 [248 Cal.Rptr. 834, 756 P.2d 221], footnote 2, the court expressed the view that because "as a general matter the warrantless entry into a residence is unconstitutional even when a felony has been committed and there is probable cause to believe that incriminating evidence or the suspected perpetrator will be found within . . . a serious question exists whether the warrantless entry into a residence is permissible under any circumstances when its sole justification is the 'reasonable suspicion' that supports detention under *Terry* v. *Ohio* . . . ." (Citations omitted.)

Clearly when the court, in *Lorenzana,* referred to justifying the officer's presence on the property under one of the established exceptions to the warrant requirement (9 Cal.3d at p. 634), the court was not thinking about the *Terry* line of cases, but about "exigent circumstances." This is evidenced by the court's reference to *People* v. *Sirhan* (1972) 7 Cal.3d 710 [102 Cal.Rptr. 385, 497 P.2d 1121] as an example of an officer's presence in defendant's rear yard as "justified by the exigencies of the unique circumstances." (*Lorenzana, supra,* 9 Cal.3d at p. 634, fn. 7.) Furthermore, if a "reasonable suspicion" of criminal activity was sufficient to justify the officer's intrusion into Lorenzana's yard, that reasonable suspicion was supplied by the tip from a reliable informant. (*Lorenzana* v. *Superior Court, supra,* 9 Cal.3d at p. 629; and see *Adams* v. *Williams* (1972) 407 U.S. 143, 146 [32 L.Ed.2d 612, 617, 92 S.Ct. 1921].) Yet, our Supreme Court disapproved the intrusion in that case.

I agree with the majority: the individual homeowner and society in general have an interest in the prevention of crime and, in accordance with that interest, the police, in certain circumstances, must be allowed to go where the criminals go. However, in my view, the "exigent circumstances" exception adequately protects the interests of society and the individual citizen in the prevention of crime while preserving the reasonable expectation of privacy in and around one's home. Exigent circumstances allow the police to make a warrantless entry onto property in "an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence." (*People* v. *Ramey* (1976) 16 Cal.3d 263, 276 [127 Cal.Rptr. 629, 545 P.2d 1333]; and see *People* v. *Dickson* (1983) 144 Cal.App.3d 1046, 1052-1053 [192 Cal.Rptr. 897].)

*U. S.* v. *Pace* (7th Cir. 1990) 898 F.2d 1218 illustrates the kind of situation in which exigent circumstances justify an officer's entry into the curtilage of a home to detain a suspect for questioning. In that case, the court upheld the detention and search of defendant Wilson in the garage of his residence based on the officers' reasonable suspicion Wilson might be an assassin on his way to kill Savides, another resident of the building. The relevant facts and the court's reasoning were as follows: "Officers Patton and Nesis, the officers who stopped Wilson and Smith and found the cocaine in the suitcase, had been staking out Savides' condominium for three weeks. They knew that their surveillance efforts were extraordinary, and they knew the reason for this special commitment of resources: experienced members of the Chicago Intelligence Unit had determined that Savides was a likely assassination target because he had broken crime syndicate rules by mixing gambling and cocaine distribution. When they saw somebody other than Savides driving Savides' car, without Savides in the car (an event they had never before seen), the officers became justifiably suspicious. The officers then followed Wilson to a restaurant, where he met Smith, and where Wilson and Smith made what appeared to be efforts to make sure they were not being watched. The officers saw Smith transfer a suitcase from his car to Wilson's, and saw the two drive off together to Savides' condominium complex. Upon realizing they were being followed, Wilson and Smith sped up and appeared to try to elude the officers.

"Based on these findings, which were not clearly erroneous, we agree with the district court that 'Patton and Nesis possessed at *least a reasonable suspicion that Wilson and Smith might be assassins* on their way to make an attempt on Savides' life.' [665 F.Supp. at p. 690.] Because of this reasonable suspicion, Patton and Nesis were entitled to stop and briefly detain Wilson and Smith to investigate and resolve their suspicions. See *Terry* v. *Ohio* [*supra*]; see also *Michigan* v. *Long* [1983] 463 U.S. 1032, 1045-1052.

"The defendants contend that Patton's warrantless entry into the garage to detain Wilson violated the Fourth Amendment because the garage was part of the 'curtilage' to Wilson's home. (Wilson lived in the condominium complex.) Generally, police may not enter a person's home to arrest that person without a warrant. *Payton* v. *New York* [1980] 445 U.S. 573. A home's 'curtilage' is the area outside the home itself but so close to and intimately connected with the home and the activities that normally go on there that it can reasonably be considered part of the home. See *United States* v. *Dunn* [1987] 480 U.S. 294, 300.

"Assuming without deciding that the garage was part of the curtilage of Wilson's condominium, we conclude that Patton did not violate the Fourth Amendment by entering the garage to detain Wilson. Payton is distinguishable; it involved a 'routine' arrest in a person's home, and the Court specifically declined to decide any issues other than the one before it. See 445 U.S. at 582-83. In this case, Patton was pursuing a man whom he reasonably suspected might be an assassin on his way to do his work, and who took what Patton considered to be evasive action upon discovering he was being followed. When Wilson entered the garage, Patton had to decide whether to pursue Wilson to investigate his suspicion or whether to let Wilson go despite the threat he might have posed to Savides. If Patton had decided to let Wilson go, and if his suspicion had been correct, the consequences could have been drastic. *Terry's* touchstone is the Fourth Amendment's general reasonableness requirement. See 392 U.S. at 21-22. Balancing the need for Patton's action (to investigate a possible threat to Savides' life) against the intrusion on Wilson's privacy (a brief detention, in a garage, to allay his suspicions), along with the circumstances surrounding that intrusion, see *id.* at 21; Long, 463 U.S. at 1046, we conclude that Patton's entry into the garage was reasonable and thus did not violate the Fourth Amendment." [Fn. omitted, italics added.] (898 F.2d at pp. 1228-1229.) Although the court based its decision on *Terry, supra,* in reality the decision did not rest on *Terry* alone but on the existence of exigent circumstances: entry into the garage was necessary to prevent what the officers reasonably believed to be an imminent and serious peril to life.

In the case before us, there was no evidence the unidentified man in the yard appeared to be engaged in any sort of criminal activity. He was simply standing in the yard. When he saw the police car drive down the alley "he immediately stepped back as if to step away from [the police.]" The man did not attempt to flee. He remained in the yard where he was detained by one officer while the other officer searched the yard.

Furthermore, no evidence in this case suggests the police had to enter appellant's yard to investigate the presence of the unidentified man. They

could have simply asked the man to approach the fence and talked to him there. The fence was only three and one-half feet high and made of chain link. It posed no barrier to communication and observation by the police. The majority argues calling to the unidentified man may have resulted in his flight into the street or deeper into appellant's backyard. This is exactly why calling to the man would have been the reasonable way to proceed. If he ran into the street he could have been detained there with no invasion of appellant's privacy. If he ran deeper into appellant's yard it might be possible to conclude his flight created exigent circumstances justifying the officers pursuing him into the yard, assuming the officers had a reasonable basis to detain the man in the first place.

On its facts, the case before us is very much like *People* v. *Winters, supra*, in which the court held police investigating a malicious mischief complaint had no right to enter defendant's backyard through a gate posted with a "no trespassing" sign and the marijuana they found there should have been excluded from evidence. The court reasoned, "Although the officers were on legitimate police business when they first approached Winters' house, no evidence suggests they were entitled to invade his backyard. . . . By trespassing into the back yard, they surpassed what was reasonable under the circumstances, *for no exigency existed to justify a suspension of Winters' Fourth Amendment rights.* The police were conducting a routine investigation—merely looking for a suspect to interview. No evidence shows [the suspect] was dangerous or even that he was attempting to evade the law." (149 Cal.App.3d at p. 708.) (Italics added.)

I do not question the right of the police to respond when they witness the commission of a crime in someone's backyard. But, this was not a case where the police observed a burglary or some other crime in progress. If they had, this certainly would have justified their entering the yard. (See *People* v. *Duncan* (1986) 42 Cal.3d 91, 98 [227 Cal.Rptr. 654, 720 P.2d 2].) It is not even a case where the officers had a reasonable *suspicion* the man in the yard was committing or about to commit a burglary or other crime on appellant's property. Indeed no evidence was introduced at the suppression hearing suggesting this is a case where the officers possessed a reasonable suspicion the man was committing or about to commit *any* crime. On the contrary, the arresting officer testified the unidentified man was detained solely because the officers did not believe he lived there and "didn't know what he was in that rear yard for. . . ."

Even if the law permitted the police to jump over fences onto private property to detain someone on "reasonable suspicion" of criminal activity, the evidence does not show a reasonable suspicion in this case. When an officer stops and detains a person, specific and articulable facts must have

caused the officer to suspect some criminal activity had taken place, was occurring, or was about to occur, and the person stopped or detained was involved in the criminal activity. (*In re Tony C., supra*, 21 Cal.3d at p. 893.) The People must show the officer personally entertained such suspicions and these suspicions were objectively reasonable. (*People v. Bower* (1979) 24 Cal.3d 638, 644 [156 Cal.Rptr. 856, 597 P.2d 115].)

The People rely on the following facts: (1) *A three-day-old anonymous tip of narcotics activity in the area.* Not only was this tip stale and possibly unreliable, no evidence existed to connect the narcotics activity with any activity on the part of the unidentified man.

(2) *The officers recognized the unidentified man from a previous arrest.* There was no evidence of how long ago this arrest occurred *or the nature of the crime.*

(3) *The officers did not believe the unidentified man lived at that residence.* This belief was based on the officers' belief the man lived four blocks away. There was no evidence to show the reasonableness of this belief. It is common knowledge people move. Moreover, if residents were subject to police sweeps of their backyards every time a neighbor was seen on their property there would be little left of privacy for any of us.

(4) *The man stepped back when he saw the police car.* This is the only evidence which comes close to supporting a belief in criminal activity but it is not enough by itself to justify a detention and certainly not enough to justify entering another person's property to accomplish the detention. (See *People v. McGaughran* (1979) 25 Cal.3d 577, 590 [159 Cal.Rptr. 191, 601 P.2d 207].)

In summary, I find four independent and sufficient grounds for holding it was unlawful for the officers to enter the backyard to detain this third person. First, none of the *Lorenzana* criteria were met. The police were not explicitly or implicitly invited onto the premises; they were not acting under color of a warrant; there were no exigent circumstances. Second, absent exigent circumstances, a reasonable suspicion is not enough to justify jumping over a fence into someone's backyard to carry out an investigative stop. Third, even if a reasonable suspicion would be enough to justify entering appellant's backyard the evidence in this case does not establish the police had a reasonable suspicion of wrongdoing on the part of the unidentified man. And, fourth, even if the police had a reasonable suspicion, entering the backyard was unreasonable under the circumstances. The police should have at least attempted to call the man over to the fence and question him there. Therefore, I conclude the police had no legitimate reason for entering

appellant's backyard and the evidence discovered during the search of the yard should have been suppressed.

While there are several grounds for my differences with the majority on this issue, I want to emphasize it is a close question. Only a slight variation in the facts would yield the opposite result in applying the analysis I argue for above. For example, if the criminal activity the officers reasonably suspected the third person of committing were thievery this alone may have been enough to justify intrusion in appellant's backyard to insure the thief was not practicing his craft at appellant's expense. Or, if the officers had attempted to accomplish their detention by ordering the suspect to come over and talk to them in the alley and instead he had fled, his flight would have created exigent circumstances to pursue him through appellant's yard. And, one can conjure other scenarios which likewise would have justified an entry into appellant's backyard. However, the sketchy story which emerged from the magistrate's hearing supplied no grounds for an intrusion into the curtilage of appellant's residence any more than it justified an unconsented entry into the house itself.

## II. The Prosecution Waived the Issue of Appellant's Standing by Not Raising It at the Time of the Penal Code Section 1538.5 Motion.

I next turn to an issue which is not close, in my opinion—the issue of appellant's standing to challenge the search of this backyard. I fear the majority opinion carves out an unwarranted and dangerous exception to the general rule requiring parties to warn the *trial* court—through objection or motion—of any deficiencies in their opponent's case or otherwise be considered to have waived the issue at the appellate level. (See pp. 957-959, *post.*)

Here the prosecution kept silent at the trial stage about appellant's failure to prove his rights in the residence of which the backyard was a part. Only when the magistrate's decision was under review in the superior court—and when it was too late to remedy the deficiency in proof did the prosecution raise this issue. Under the normal rules of appellate review this objection came too late. There is no reason to suspend those normal rules—as the majority opinion does—for hearings on motions to suppress. Indeed to do so discriminates against the very proceedings we depend upon to preserve our constitutional rights under the Fourth Amendment.

It is now well established the prosecution may be deemed to have waived its objection to defendant's standing when it fails to question standing "in a

timely fashion during the litigation." (*Steagald* v. *United States* (1981) 451 U.S. 204, 209 [68 L.Ed.2d 38, 44, 101 S.Ct. 1642].)

In *Steagald,* the police, armed with an arrest warrant for one person, conducted a search for him in the home of defendant without first obtaining a search warrant. The police did not get their man but they did find narcotics leading to defendant's arrest and conviction on federal drug charges. In the Supreme Court, the government argued for the first time that defendant may have lacked a sufficient expectation of privacy in the house and that the case should be remanded to the trial court for examination of this factual question. The court rejected that suggestion.

"Aside from arguing that a search warrant was not constitutionally required, the Government was initially entitled to defend against petitioner's charge of an unlawful search by asserting that petitioner lacked a reasonable expectation of privacy in the searched home, or that he consented to the search, or that exigent circumstances justified the entry. The Government, however, may lose its right to raise factual issues of this sort before this Court when it has made contrary assertions in the courts below, when it has acquiesced in contrary findings by those courts, or when it has failed to raise such questions in a timely fashion during the litigation." (451 U.S. at p. 209 [68 L.Ed.2d at pp. 43-44].)

The issue before us is not whether the question of standing can be waived but at what point in the proceeding should it be said the prosecution "has failed to raise [standing] in a timely fashion." I agree with the decision in *Rodriguez* v. *Superior Court* (1988) 199 Cal.App.3d 1453, 1461-1462 [245 Cal.Rptr. 617]: having failed to assert defendant's lack of standing at the suppression hearing, the People are precluded from raising the issue on review of that hearing.

In *Rodriguez,* defendant's suppression motion was heard initially by the superior court, which denied it. Defendants sought a writ of mandate to overturn that decision. In opposition to the writ the People contended defendant Ofelia Rodriguez could not claim in the writ petition, for the first time, that she resided in the searched premises. Absent such a claim at the suppression hearing, the People argued, Ofelia's suppression motion was properly denied for lack of standing. The appellate court disagreed and held: "The simple answer to the People's contention is that in the trial court they never challenged Ofelia's legitimate expectation of privacy in the . . . residence. They cannot now raise this issue." (199 Cal.App.3d at p. 1461, citing and quoting from *Steagald* v. *United States, supra.*) "Having failed at

the suppression hearing to assert that Ofelia lacked a reasonable expectation of privacy in the searched home, the People are now precluded from raising the issue." (*Id.* at p. 1462.)

In the present case we have a situation analogous to *Rodriguez* and *Steagald.* At the suppression hearing in the municipal court neither party introduced any evidence relating to standing. On the contrary, as the People conceded at oral argument, the parties and the court proceeded as if appellant had standing. Indeed as of this moment there is no substantive challenge from the prosecution denying appellant had standing, only the technical argument he failed to prove it. Upon review of the municipal court's decision denying the suppression motion, the People noticed appellant had not proved he resided at the premises in question and argued for the first time appellant lacked standing to assert an expectation of privacy in the chicken coop. The objection came too late.

Fundamental fairness compels a holding that if the People do not contest standing when the suppression motion is made at the preliminary hearing they should be barred from raising standing on review in the superior court where the defendant is barred by Penal Code section 1538.5 from introducing evidence of standing. The same rationale that prohibits the People from switching theories on appeal to justify a search applies where the People attempt for the first time at the review hearing to raise a factual question of standing knowing full well the defendant is barred from meeting the challenge. As the court explained in *People* v. *Miller* (1972) 7 Cal.3d 219, 227 [101 Cal.Rptr. 860, 496 P.2d 1228], ". . . [T]he People cannot introduce on appeal a new theory to justify the search, in view of the defendant's lack of opportunity to present evidence in response to it . . . or to argue before the trier of fact the theory's invalidity or inapplicability."

Elimination of de novo review of Penal Code section 1538.5 motions was not intended to allow the People to blind-side the defendant with a claim to which he is barred by law from responding. Appellant's expectations of privacy while sitting in the chicken coop were beyond question at the review hearing.

It is small wonder the People's representative conceded error at the oral argument on this appeal as to the issue of standing. To argue otherwise would have required him to ask for a unique exception to the traditional way trials and hearings are conducted in California. In other trials and hearings, if one party fails to introduce evidence to prove an element of a claim or defense, the other party has the duty to point this out to the trial court either through an objection or some sort of motion. Among other

things, this gives the party with the burden of proof on that element an opportunity to ask the trial court for leave to reopen the case and supply the missing proof. The trial court has the discretion to reopen the evidence phase to accept evidence proving an element which had not yet been mentioned by the party carrying the burden on that issue. (See, e.g., *Rodin* v. *American Can Co.* (1955) 133 Cal.App.2d 524, 534 [284 P.2d 530] [court required to allow supplement to opening statement after nonsuit motion made for failure to promise proof of element]; *Eatwell* v. *Beck* (1953) 41 Cal.2d 128, 133-134 [257 P.2d 643] [abuse of discretion to deny plaintiff opportunity to reopen the case after conclusion of plaintiff's case and supply missing proof]; *Sanchez* v. *Bay General Hospital* (1981) 116 Cal.App.3d 776, 793 [172 Cal.Rptr. 342] [trial court has discretion to allow plaintiff to reopen after motion for directed verdict points out failure of proof]; 4 Cal. Trial Guide (1986) §§ 80.01[3], 80.20[3].)

On the other hand, if the other party sits back and allows the trial to conclude without objecting to the lack of proof of an essential element of a claim or defense, it is too late to raise this failure at the time of appeal. The potential ground for appeal is deemed to be waived. As Witkin points out: "The circumstances may involve such intentional acts or acquiescence as to be appropriately classified under the headings of estoppel or waiver. . . . Often, however, the explanation is simply that it is *unfair to the trial judge and to the adverse party* to take advantage of an error on appeal when it could easily have been corrected at the trial." (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 311, p. 321.) (Italics in original).

The rationale for this rule of appellate review is compelling. "In the hurry of the trial many things may be, and are, overlooked which would readily have been rectified had attention been called to them. The law casts upon the party the duty of looking after his legal rights and of calling the judge's attention to any infringement of them. *If any other rule were to obtain, the party would in most cases be careful to be silent as to his objections until it would be too late to obviate them,* and the result would be that few judgments would stand the test of an appeal." (*Sommer* v. *Martin* (1921) 55 Cal.App. 603, 610 [204 P. 33], italics added.)

The same rule applies in criminal cases and for the same reason. (*People* v. *Belmontes* (1988) 45 Cal.3d 744, 766 [248 Cal.Rptr. 126, 755 P.2d 310]; *People* v. *Green* (1980) 27 Cal.3d 1, 22 [164 Cal.Rptr. 1, 609 P.2d 468]; *Mestas* v. *Superior Court* (1972) 7 Cal.3d 537 [102 Cal.Rptr. 729, 498 P.2d 977].) It is difficult to see why we should depart from this long-standing common sense rule when it comes to hearings on Penal Code section 1538.5 motions. In this context, the hearing before the magistrate is the trial court

proceeding. For practical purposes, recent amendments have reduced the "hearing" before the superior court judge to an appellate review of the magistrate's trial court decision. The People's objection first made in superior court came too late because the superior court could not allow the objection to be remedied by introduction of evidence on the element of appellant's standing to sue. For this purpose, at least, it was serving not as a trial court but as an appellate court. Accordingly, it was as if a litigant in any case waited until his opening brief in the appellate court to first raise his opponent's failure to prove an essential element of his claim or defense.

If this were a piddling civil case over a few dollars and the defendant had failed to object or move for nonsuit (or similar relief) when the plaintiff neglected to prove some technical element of his claim, the appellate courts would deem the defect to have been waived. In the instant case it is not just money at stake, it is appellant's constitutional rights. And the prosecutors did what courts have most feared at least as far back as the *Sommer* v. *Martin* opinion—they were "careful to be silent as to [their] objections until it would be too late to obviate them." (Either that, or they failed to note standing was an element and had not been proved until after the magistrate's hearing was concluded. If so, it is difficult to argue the prosecution should benefit from the negligence it shared with appellant's lawyer.)

I would not object so strenuously if the majority concluded the case should be remanded and appellant required to prove his standing in the trial court. (Appellant has had that ability all along. Indeed he brought more than enough evidence to the superior court proceeding to prove this element, but was denied the opportunity.) But instead the majority opinion means appellant and like defendants simply lose their right to reach the merits of their constitutional challenges even where they actually had a reasonable expectation of privacy in the property which was searched. Does this show proper respect for the value of constitutional protections? I think not.

Furthermore, not that it should be determinative, but I also have reservations about the implications of the majority opinion for judicial economy in the trial courts. Every defendant—and every defense counsel—will feel it incumbent upon themselves to prove standing *ad nauseum* in each and every Penal Code section 1538.5 hearing. They will do so even when, as here, everyone in the courtroom—judge, prosecutor, defense counsel, police officers, and maybe even the bailiff—knows the defendant owned the premises or otherwise had a reasonable expectation of privacy and thus standing to challenge the search.

So we are left with a fundamental question. If constitutional rights remain important in this state, why should we be more forgiving of the prosecution's failure to raise the issue of appellant's failure to prove standing in the trial court than we are of an ordinary litigant's similar failure in other kinds of litigation? In my view, there is no satisfactory answer to that question.

Appellant's petition for review by the Supreme Court was denied September 26, 1990.