Filed 4/30/14  P. v. Richardson CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | E056401 |
| Plaintiff and Respondent, | (Super.Ct.No. FMB1000338) |
| v. | **ORDER MODIFYING OPINION AND DENIAL OF PETITION FOR REHEARING** |
| EDMOND WARREN RICHARDSON et al., | |
| Defendants and Appellants. | **[NO CHANGE IN JUDGMENT]** |

Appellant's petition for rehearing filed April 24, 2014, is denied.  The opinion filed in this matter on April 10, 2014, is modified as follows:

On page 2, the last sentence of the first full paragraph should read as follows:

The court sentenced Laster to a determinate sentence of 15 years in prison and Richardson to 30 years to life in prison under the Three Strikes law.

Except for this modification, the opinion remains unchanged.  This modification

does not effect a change in the judgment.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON_____
J.

We concur:


RAMIREZ_____
P.J.


HOLLENHORST_____
J.

Filed 4/10/14 (unmodified version)

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E056401 |
| v. | (Super.Ct.No. FMB1000338) |
| EDMOND WARREN RICHARDSON et al., | OPINION |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County. Daniel W. Detienne, Judge. Affirmed.

Patricia L. Brisbois, under appointment by the Court of Appeal, for Defendant and Appellant Edmond Richardson.

Jean Ballantine, under appointment by the Court of Appeal, for Defendant and Appellant Perish Valdez Laster.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson, and Laura A.

1

Glennon, Deputy Attorneys General, for Plaintiff and Respondent.

I

INTRODUCTION[1]

Defendants Perish Valdez Laster and Edmond Warren Richardson threatened a college student and robbed him of his backpack.  After a mistrial, a jury convicted defendants in a second trial of second degree robbery and making criminal threats.  (§§ 211, 422.)  The court sentenced Laster to a determinate sentence of 15 years in prison and Richardson to 25 years to life in prison under the Three Strikes law.

The prosecution's case was based on circumstantial evidence.  On appeal, defendants challenge the trial court's denial of their motion to suppress.  (§ 1538.5.)  Laster also asserts there is insufficient evidence for his conviction and that the $10,000 restitution and parole revocation fines imposed must be reversed.  Richardson joins in the latter argument.  We reject these contentions and affirm the judgment.

II

BACKGROUND

*A.  Herring's Testimony*

After 1:00 a.m. on August 23, 2010 in the community of Joshua Tree, Aaron Herring went outside to the carport of his apartment building to smoke a cigarette.  It was "pitch black" and two men approached him, yelling at him not to move or his "head or face" would be "blown off."  Because it was so dark, he could not see the suspects or their

---

[1] Unspecified statutory references are to the Penal Code.

2

height, weight, or color and length of their hair. The assailants searched his pockets and ordered him to place his keys on his car and to lie face down between the car and a wall. Herring did not try to look at them because he was convinced they were armed and his life was in jeopardy. He did not actually see a gun although he initially said he had because he was so upset. He listened to them rummaging through his car and he thought they sounded African-American from their speech patterns. Thereafter, his backpack, containing his college books and papers, was missing from his car. The men left in a vehicle with a loud modified or performance exhaust system. Herring then called the police.

B. *Deputy Sheriffs' Testimony*

A deputy sheriff, Armando Cantu, was parked in his patrol car, doing paperwork when a dark passenger vehicle with a loud exhaust system drove by at a high rate of speed and did not make a full stop at a stop sign. Cantu followed the vehicle to a residential driveway at a Desert Air address where he watched two African-American men leave the car and enter the residence.

Cantu then left to respond to the robbery report by Herring. Cantu took Herring's statement, attempted to collect fingerprints from his vehicle, and photographed the area and two sets of shoe impressions in the dirt. The shoe impressions led from the street to the carport and back. Cantu described one set as a "wavy W-type" pattern and the other as a "squared" pattern. Herring was upset and shaken and told Cantu the robbers had threatened him with a gun. When Herring mentioned the loud exhaust system of the departing vehicle, Cantu was reminded of the car he had followed earlier to the

3

residential driveway. Cantu decided to check for shoe impressions at the Desert Air residence that might match the ones at the carport.

Cantu and his watch commander, Sergeant Hutchins, arrived at the Desert Air residence at 2:14 a.m. The vehicle Cantu had followed was still parked in the driveway. In the dirt next to the driveway, Cantu photographed shoe impressions matching those from the robbery scene. Cantu and Hutchins "jumped" or "hopped" over a low fence, which was locked, and walked to the front door to contact the people inside. Larissa Stanley, Laster's sister, responded that she lived there with her children and Richardson, her fiancé.

Richardson came to the front door and said he had been sleeping and his children and Stanley were the only people at home. The deputies told Richardson they were conducting an investigation and asked if they could check his shoes. Richardson brought two or three pairs of shoes to the front door but they did not match any of the shoe impressions from the carport or the driveway.

Richardson said he had gone alone to the Circle K for cigarettes earlier that night and, on his way home, he saw a patrol car following him. Cantu told Richardson he had seen two men exit the car at the residence.

At that point, the deputies searched the house and located Laster in bed in a child's bedroom. Laster claimed he had been sleeping there all night and had no idea what was going on. As the search proceeded, in the kitchen trash, Cantu found rubber gloves and Shaq athletic shoes with a square pattern on the sole, matching the shoe prints found at

4

the carport and the driveway. An investigator subsequently found a black glove inside one of the Shaq shoes.

In the attic, the deputies found a school backpack, a loaded nine-millimeter semiautomatic handgun, a cloth mask, a police scanner, and a pair of Reebok athletic shoes. The Reebok shoes had a "wavy W" pattern in the soles and matched one set of the shoe impressions found at the carport and the driveway. Inside the backpack were books and a binder containing a receipt for Aaron Herring.

Both defendants were detained in the patrol car. After Cantu showed them the backpack, one of them was recorded saying, "oh, my God, they found it."

*C. Larissa Stanley's Testimony*

Stanley testified that Richardson was her fiancé and Laster was her brother. During the day on August 22, 2010, Richardson came and went from the residence several times in Stanley's car, which has a loud modified exhaust system. In the evening, Richardson left to go to a Circle K.

Laster was at the residence around noon or 1:00 p.m., and Stanley did not know when he left. Laster had his own key and free access to the house. Stanley and Laster grew up together and do not speak in a vernacular or with an accent.

Stanley was awakened by the deputies knocking at the front door. She claimed that, when she got up to answer the door, Richardson was outside the bedroom arguing with Marty Hall, an old high school friend of hers and her brother. Stanley believed Hall left by the back door because it was open and the deputies did not find Hall in the house. She did not tell the deputies about Hall at the time because too much was going on. She told

5

the defense investigator about Hall on September 28, 2010. She did not testify about Hall at the preliminary hearing because no one asked her about him. She testified about Hall at length in the first trial with the same prosecutor.

Stanley did not want to see anything bad happen to Richardson or Laster. Although she admitted she was willing to lie for them, she claimed she was not lying at trial. She was subpoenaed by the prosecution and did not want to testify.

*D. Defense Case*

The handgun, magazine, and ammunition booked in evidence were processed for fingerprints and DNA. No fingerprints were found and no DNA evidence was presented by the prosecution.

## III

## THE SEARCH OF THE RESIDENCE TO OBTAIN EVIDENCE

Both defendants contend their Fourth Amendment rights were violated when the officers climbed over the fence to achieve access to the front door of Richardson's residence. Specifically, both defendants maintain they had a reasonable expectation of privacy in the curtilage, the fenced area of the residence, and no justification existed for the intrusion. A home's "curtilage," "'the land immediately surrounding and associated with the home,' 'has been considered part of the home itself for Fourth Amendment purposes.' (*Oliver v. United States* (1984) 466 U.S. 170, 180.) But that did not prohibit the police officers from approaching the front door . . . . (See, e.g., *U.S. v. Taylor* (4th Cir. 1996) 90 F.3d 903, 909 [the 'front entrance was as open to the law enforcement officers as to any delivery person, guest, or other member of the public']; see also *United States v. Dunn*

6

(1987) 480 U.S. 294, 300 [in identifying the curtilage, the 'central' inquiry is 'whether the area harbors the "intimate activity associated with the 'sanctity of a man's home and the privacies of life.'" [Citation.]'].)" (*People v. Robinson* (2012) 208 Cal.App.4th 232, 253, fn. 23.)

Laster also claims that the trial court erred in finding he did not have standing to join Richardson's motion to suppress. To the extent Laster cannot demonstrate standing, he contends he received ineffective assistance of counsel because his attorney did not conduct an adequate cross-examination. Defendants argue that any consent obtained from Richardson and Stanley was involuntary and coerced and the trial court's error in denying the suppression motion was not harmless beyond a reasonable doubt.

As a threshold matter, we agree that Laster had no standing because he was not a resident of Richardson's home — only an occasional guest — and he was hiding in a child's bedroom to escape police detection. For the same reasons, his claim of ineffective assistance of counsel also fails. Next, the deputies were not required to obtain a warrant before they entered the front yard to access the front door because they had probable cause to believe the two robbery suspects were inside the home and would either flee, dispose of incriminating evidence, or conceal the robbery proceeds. Third, the record supports the trial court's finding that Stanley and Richardson were not coerced and voluntarily signed the consent forms allowing the search. Fourth, assuming the warrantless entry was not justified, the evidence in the home would have been inevitably discovered after the pending search warrant issued.

7

*A. The Suppression Motion*

At the preliminary hearing, Deputy Cantu testified that, minutes before he responded to Herring's robbery report, he observed a dark-colored car, with a loud exhaust system, speeding away from the location of the robbery, and subsequently failing to stop at a stop sign. Cantu followed the car, intending to perform a traffic stop, but the car pulled into the driveway of the Desert Air home. A fence and gate surrounded the house and two men exited the car and unlocked the gate before entering the house. The men, who appeared to be African-American, entered the home. Cantu then received the dispatch about the robbery.

Herring told Cantu about the robbery, including the information that he thought the two men were African-American based on their speech, and that they may have had a gun. Herring also said the suspects fled in a car with a loud exhaust system. Additionally, Cantu recorded two sets of shoe impressions—a wavy pattern and a square pattern—in the dirt leading from the carport to the street.

Because he thought the dark-colored car may have been connected to the robbery, Cantu returned to the Desert Air residence and found two sets of matching shoe impressions. A three-foot or waist-high chain-link fence with a locked gate, surrounded the home about 50 feet from the front door. The shoe impressions were near the locked gate. Cantu and Hutchins used a rock or small boulder as a stepping stone to climb over the fence and knock on the front door.

Cantu told Stanley and Richardson they were investigating a robbery and, when the officers asked Richardson where he had been earlier that night, he became defensive,

8

finally claiming he was at a Circle K store, buying cigarettes. Richardson told the officers to wait at the front door while he retrieved three pairs of tennis shoes, none of which matched the shoe impressions from the driveway or the crime scene. Cantu asked whether he could come in the house to look for another pair of shoes. Richardson said they needed a search warrant. Cantu asked Stanley for her consent to search and she refused.

Cantu informed Richardson there could be evidence in the home leading to the apprehension of a suspect and he was detaining Richardson pending further investigation and a search warrant. Hutchins contacted Detective Emon, who was on-call in Yucaipa about an hour distant from Joshua Tree, to obtain a search warrant. Cantu handcuffed Richardson and placed him in the backseat of the patrol car. During a safety search of the home, Hutchins discovered Laster in the bedroom. Cantu detained Laster and also placed him in the patrol car.

After Cantu read Stanley her *Miranda*[2] rights, she stated she understood and agreed to waive her rights. Cantu explained that defendants were being detained pending a search warrant. Cantu also told Stanley that it was suspicious that Laster was discovered in the home and that, if Stanley was arrested for being an accessory, her children could be taken into custody by Child Protective Services (CPS). (§ 32.)

Another deputy, Jaime Crispin, arrived and placed Stanley in her patrol car. Crispin told Stanley she could be considered an accessory and could lose custody of her

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436, 468.

two children. Stanley started to cry and agreed to sign a consent-to-search form instead of waiting for the search warrant. Richardson agreed to sign the form after learning that Stanley had signed it.

The deputies searched the home and observed the ceiling popcorn near the attic opening had been disturbed. In the attic, the deputies found a gun, a cloth mask, the police scanner; a pair of athletic shoes, a backpack with books, and a binder with Herring's name on it. One pair of shoes had a wavy pattern and one had a square pattern.

After the search, Cantu read defendants their *Miranda* rights, and interviewed them separately. Richardson appeared angry and denied knowing how the items were in the house. Richardson admitted he had seen a patrol car following him earlier that evening when he was alone in the car. Finally, Richardson conceded he knew what had happened, and then said, "snitch," motioning to Laster. Laster stated only that he had been sleeping and did not know what was happening.

In the preliminary hearing, Stanley claimed the only reason she consented to the search was so CPS would not be contacted although she admitted Crispin never promised that CPS would not be called. Stanley did not know Laster was present in her home that night. Lastly, Stanley stated that the locked gate and the chain-link fence which surrounds the house is open to public view.

Richardson also claimed he only consented to the search because he did not want CPS to be contacted. On cross-examination, Richardson admitted he had been convicted of robbery previously and that he was aware of his *Miranda* rights, including the right not to

10

consent. Richardson understood what a search warrant was and knew one was being issued that night. He knew Stanley could be charged as an accessory.

Defense counsel argued that the police could not enter the fenced yard without a search warrant and that no exigent circumstances existed allowing entry. Additionally, the consents given by Richardson and Stanley were tainted based on the initial illegal entry. Laster's lawyer argued Laster had standing to join the motion because he is Stanley's brother and a frequent visitor to her home even though Stanley had testified she had no idea that Laster was present in the home that night. Laster's counsel also argued it was impossible for the officers to see the sets of shoe impressions from outside the fenced yard and, even if they could, their observations violated his client's reasonable expectation of privacy.

The People responded that the officers were lawfully standing outside the fenced yard because Stanley had admitted the area was open to public view through the chain-link fence. Furthermore, both Stanley and Richardson's consent was legally obtained because they understood their rights and knew that they could withhold their consent.

The trial court denied the suppression motion, finding that Laster did not have standing and that exigent circumstances existed permitting the police to climb over the fence because they were pursuing a fleeing suspect. Finally, the trial court held the consent obtained from Stanley and Richardson was voluntary because the officers did not threaten Stanley and because she knew defendants were being detained while the deputies waited to obtain the pending search warrant.

*B. Standard of Review*

When reviewing a trial court's ruling on the admissibility of evidence obtained in violation of a defendant's Fourth Amendment rights, the reviewing court, "'accept[s] the trial court's resolution of disputed facts and inferences, and its evaluation of credibility, if supported by substantial evidence.'" (*People v. Haley* (2004) 34 Cal.4th 283, 299, quoting *People v. Wash* (1993) 6 Cal.4th 215, 235; *People v. Dachino* (2003) 111 Cal.App.4th 1429, 1432.) The reviewing court must accept the version of events most favorable to the People to the extent it is supported by the record. (*People v. Maury* (2003) 30 Cal.4th 342, 404.) The reviewing court, however, exercises its independent judgment to determine whether the statements were obtained in violation of *Miranda*. (*People v. Massie* (1989) 19 Cal.4th 550, 576; *People v. Waidla* (2000) 22 Cal.4th 690, 730; *People v. Box* (2000) 23 Cal.4th 1153, 1194; *Dachino,* at p. 1432.)

*C. Standing for Laster*

Laster claims he has standing to challenge the search because he was an overnight guest. Even though Stanley did not know he was in the home that night, he often slept in the extra bedroom, and thus, he had a reasonable expectation of privacy. However, no evidence was presented at the suppression motion demonstrating Laster was a common overnight guest.[3] Notwithstanding the foregoing, defendant had no reasonable expectation of privacy because he was hiding from the police.

---

[3] At trial, Stanley testified that Laster stayed at the home a couple of times a month in her daughter's bedroom and that he had a key to the house but that she had never heard Laster call the residence his home. Also, while Laster would normally enter

*[footnote continued on next page]*

12

A defendant has the burden at trial of establishing a legitimate expectation of privacy. (*People v. Jenkins* (2000) 22 Cal.4th 900, 972.)  The moving party must show "'an actual (subjective) expectation of privacy,' . . . [and that the] subjective expectation of privacy is 'one that society is prepared to recognize as "reasonable,"' . . . ." (*Smith v. Maryland* (1979) 442 U.S. 735, 740.)  "Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society. One of the main rights attaching to property is the right to exclude others, [citation], and one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude. Expectations of privacy protected by the Fourth Amendment, of course, need not be based on a common-law interest in real or personal property, or on the invasion of such an interest." (*Rakas v. Illinois* (1978) 439 U.S. 128, 143, fn. 12.)

No set formula determines "a reasonable expectation of privacy in the place searched, but the totality of the circumstances are considered. [Citation.]  Among the factors sometimes considered in making the determination are whether the defendant has a possessory interest in the thing seized or place searched [citation], 'whether he has the right to exclude others from that place; whether he has exhibited a subjective expectation that it would remain free from governmental invasion; whether he took normal precautions to

*[footnote continued from previous page]*
through the front door, Stanley did not hear him the night of the robbery, nor was she aware that he was even in the home.

13

maintain his privacy and whether he was legitimately on the premises.' [Citation.]" (*In re Rudy F.* (2004) 117 Cal.App.4th 1124, 1132.) The greater the number of these factors, the more likely a protectable expectation of privacy will be found when a person is on the premises of another. (*People v. Koury* (1989) 214 Cal.App.3d 676, 686.)

An overnight guest may have a reasonable expectation of privacy. (*Minnesota v. Olson* (1990) 495 U.S. 91, 96-97.) But the Supreme Court has not approved a rule that any person "legitimately on the premises" may challenge the validity of the search. (*Rakas v. Illinois, supra*, 439 U.S. at p. 143.) Occasional presence as a guest or invitee is insufficient to confer an expectation of privacy. (*People v. Ayala* (2000) 24 Cal.4th 243, 279.)

In *People v. Magee* (2011) 194 Cal.App.4th 178, officers were on patrol in a neighborhood known for narcotic sales when they saw the defendant who had a history of dealing drugs. When police attempted to contact the defendant, he "jogged hurriedly" away towards his grandmother's home. The officers followed the defendant into the home where he entered the bathroom. One officer kicked in the bathroom door, and observed the defendant leaning over the toilet and flushing a bag which contained cocaine base. (*Id.* at pp. 180-181.) The defendant successfully moved to suppress all evidence obtained after the officers' entry into the home, and the People appealed the trial court's ruling, claiming the defendant did not have standing to assert a violation of his Fourth Amendment rights. (*Id.* at pp. 182-183.)

The appellate court in *Magee* held the defendant was not in the home simply for a social visit but to escape from police. (*People v. Magee, supra*, 194 Cal.App.4th at pp. 186-

14

187.) Accordingly, "[a]lthough a regular guest such as defendant may well have a legitimate expectation of privacy during a social visit, that does not mean that society is prepared to recognize as reasonable the privacy expectation defendant claims here: an expectation that his ongoing social relationship with the residents of the Mark Avenue house meant that he could use the house as a sanctuary to escape contact with the police." (*Id*. at p. 187.)

Similarly, Laster cannot claim he had a reasonable expectation of privacy while visiting his sister's home. The evidence at the preliminary hearing demonstrated defendants' car was speeding away from the scene of the crime. While Laster may have stayed at his sister's previously, he was not acting as a casual visitor that night. Instead, he was hiding from the police in one of the children's bedrooms shortly after committing the robbery. In addition, defendants used the home to dispose of or hide any incriminating evidence in the trash or the attic. Therefore, Laster lacked a reasonable expectation of privacy in the residence because he was not legitimately in the residence as an overnight guest. He cannot claim a reasonable expectation of privacy when he was hiding from the police in the bedroom. (*People v. Magee, supra*, 194 Cal.App.4th at p. 190.)

Even if Laster's counsel had elicited the facts that became apparent at trial, the result would have been the same. In considering a claim that trial counsel provided ineffective assistance, a reviewing court "presume[s] that counsel rendered adequate assistance and exercised reasonable professional judgment in making significant trial decisions." (*People v. Holt* (1997) 15 Cal.4th 619, 703, citing *Strickland v. Washington* (1984) 466 U.S. 668, 690.) A defendant bears the burden of establishing both: "'(1) [T]hat

15

counsel's representation fell below an objective standard of reasonableness; *and* (2) that there is a reasonable probability that, but for counsel's unprofessional errors, a determination more favorable to defendant would have resulted. [Citations.] If the defendant makes an insufficient showing on either one of these components, the ineffective assistance claim fails. Moreover, "'a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.' [Citation.]"'" (*Holt,* at p. 703.) Specifically, Laster claims his counsel rendered inadequate representation at the preliminary hearing when he failed to question Stanley more fully about how frequently Laster stayed in the home. But even if Laster was an intermittent overnight guest, he still lacked standing to join Richardson's suppression motion because he was there to evade police contact. Under these circumstances, Laster could not show he was prejudiced by his counsel's performance.

*D. Warrantless Entry*

As a threshold issue, we hold it did not constitute a search for the deputies to observe the matching sets of shoe impressions in the dirt area near the gate. A defendant must be able to assert a legitimate (subjective) and reasonable (objective) expectation of privacy. (*Rakas v. Illinois, supra*, 439 U.S. at p. 143; *Cady v. Dombrowski* (1973) 413 U.S. 433, 439; *People v. Camacho* (2000) 23 Cal.4th 824, 830-831.) The Fourth Amendment expressly recognizes a legitimate expectation of privacy in one's home and the curtilage, "the land immediately surrounding and associated with the home." (*Oliver v. United States, supra,* 466 U.S. at pp. 178-180 & fn. 11; *Kyllo v. United States* (2001) 533 U.S.

16

27, 31.) Property open to public view is not accorded Fourth Amendment protection. (*Camacho,* at p. 831.) In *People v. Edelbacher* (1989) 47 Cal.3d 983, 1015, the California Supreme Court held observation of shoe tracks on the front porch, driveway, and front yard portions of the home does not constitute a search.

Here the chain-link fence was only waist-high, about three or three and a half feet. Stanley testified she did not have a reasonable expectation of privacy while standing in the front yard. The officers were standing outside the fence near the driveway. Like any passerby, the officers could look through and over the chain-link fence and see the shoe impressions in the dirt near the locked gate. Because the matching sets of shoe impressions were in plain view, the officers' observations of them did not constitute a search.

In this case, however, the record supports that the deputies were not trespassing in the front yard but were entering a curtilage area "impliedly open to the public. 'A sidewalk, pathway, common entrance or similar passageway offers an implied permission to the public to enter which necessarily negates any reasonable expectancy of privacy in regard to observations made there. The officer who walks upon such property so used by the public does not wear a blindfold; the property owner must reasonably expect him to observe all that is visible. In substance the owner has invited the public and the officer to look and to see.' [Citations.]

"""It is clear that police with legitimate business may enter areas of the curtilage which are impliedly open, such as access routes to the house. In so doing they are free to keep their eyes open. [Citation.] An officer is permitted the same license to intrude as a

17

reasonably respectful citizen. [Citation.] However, a substantial and unreasonable departure from such an area, or a particularly intrusive method of viewing, will exceed the scope of the implied invitation and intrude upon a constitutionally protected expectation of privacy. [¶] What is reasonable cannot be determined by a fixed formula. It must be based on the facts and circumstances of each case. [Citation.]"' (*People v. Thompson* (1990) 221 Cal.App.3d 923, 943.) As summarized by a leading text: '[W]hen the police come on to private property to conduct an investigation or for some other legitimate purpose and restrict their movements to places visitors could be expected to go (e.g., walkways, driveways, porches), observations made from such vantage points are not covered by the Fourth Amendment.' (1 LaFave, Search and Seizure (4th ed. 2004) Residential Premises, § 2.3(f), 598, 600-603, fns. omitted.)" (*People v. Chavez* (2008) 161 Cal.App.4th 1493, 1500.)

Here, the deputies easily observed the incriminating footprints from outside the chain-link fence. As Stanley testified, a person standing outside the fence could easily see what was happening in the front yard. Thereafter, the deputies used a rock to facilitate jumping over the low fence but they did so for the reasonable purpose of gaining access to the front entrance of the house. As such, when the deputies came on the private property to conduct an investigation, they restricted their movements to places a visitor could be expected to go.

The record also demonstrates the deputies had sufficient probable cause to believe the robbery suspects were evading discovery and that the destruction or concealment of evidence was imminent. Probable cause exists when the facts known to the arresting

18

officer amount to a reasonable ground for belief of guilt.  (*People v. Thompson* (2006) 38

Cal.4th 811, 818.)  Deputies Cantu and Hutchins stepped over the fence to knock on the

front door of the residence and speak to the people inside regarding the armed robbery.

They believed the residents were involved and approached the front door to have a

consensual conversation—a "knock and talk."  (*People v. Rivera* (2007) 41 Cal.4th 304,

311; *United States v. Hammett* (9th Cir. 2001) 236 F.3d 1054, 1060.)  Under these

circumstances, we conclude the deputies were justified in crossing the fence to contact

the occupants because they reasonably believed evidence related to the crime could be

destroyed or that suspects of the crime might continue their efforts to evade police.

Therefore, climbing over the fence was not a warrantless entry and sufficient exigent

circumstances justified approaching the house.  (*People v. Torres* (2012) 205 Cal.App.4th

989, 993-994; *People v. Ramey* (1976) 16 Cal.3d 263, 276.)

In their reply briefs, both defendants cite to the recent case of *Florida v. Jardines* (2013)

569 U.S. ____, 133 S.Ct. 1409, 185 L.Ed.2d 495, in which the issue posed was "whether

using a drug-sniffing dog on a homeowner's porch to investigate the contents of the home

is a 'search' within the meaning of the Fourth Amendment."  (*Id.* at p. ____, 133 S.Ct.

1409, 1413.)  Five justices held that, by bringing the dog on the porch, the officers had

physically intruded into the curtilage of the home, and thus committed a search of the

home.**4**  No such intrusion occurred in this case in which the officers entered the front yard for the purpose of a "knock and talk" investigation.

*E.  Stanley and Richardson's Voluntary Consent*

The record also contradicts defendants' claim that Stanley and Richardson's consent was not voluntary.  "The voluntariness of consent is a question of fact to be determined from the totality of circumstances.  [Citations.]  If the validity of a consent is challenged, the prosecution must prove it was freely and voluntarily given—i.e., 'that it was [not] coerced by threats or force, or granted only in submission to a claim of lawful authority.'  [Citations.]"  (*People v. Boyer* (2006) 38 Cal.4th 412, 445-446, quoting *Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 227.)  The trial court's findings—whether express or implied—must be upheld if supported by substantial evidence.  (*People v. Monterroso* (2004) 34 Cal.4th 743, 758.)  The issue of witness credibility is the exclusive province of the trial court hearing the motion.  (*In re Arturo D.* (2002) 27 Cal.4th 60, 77.)  Stanley was not handcuffed.  Initially, Stanley had refused to consent to the search.  None of the deputies threatened Stanley that CPS would take her children if she did not consent.  Instead, Deputy Crispin explained she answered Stanley's questions about the

---

**4**  Four justices dissented concluding the officers were no different than other members of the public who have "a license to . . . approach the front door of a house and to remain there for a brief time," and thus there was no governmental intrusion.  (*Florida v. Jardines, supra,* 569 U.S. at p. ____, 133 S.Ct. 1409, 1420 (dis. opn. of Alito, J.).)  Nor was there a violation of *Katz v. United States* (1967) 389 U.S. 347:  "'A reasonable person understands that odors emanating from a house may be detected from locations that are open to the public, and a reasonable person will not count on the strength of those odors remaining within the range that, while detectable by a dog, cannot be smelled by a

*[footnote continued on next page]*

investigation. Stanley testified Crispin never promised that CPS would not be called if she consented to a search. When Crispin asked Stanley if there was any evidence in the home, Stanley responded there was not. Stanley was told that at the conclusion of the search she would be returned to her children if no evidence was found. After waiting a few minutes, Stanley signed the form. Thus, nothing in the record indicates that Stanley's consent was involuntary or coerced. Instead, the deputies responded to her various questions about the search warrant process. Substantial evidence in the record supports the trial court's findings that Stanley's consent was voluntary.

The record also does not establish that Richardson's consent was involuntary. Richardson testified that Cantu explained that, if Stanley was taken into custody, CPS would be contacted to take the children. If so, it is reasonable to find Richardson gave his consent voluntarily to avoid that result.

Furthermore the consent of Stanley and Richardson was not invalid because of the warrantless entry when Cantu and Hutchins climbed over the fence. As already discussed, the entry into the front yard did not violate defendants' constitutional rights. Accordingly, the deputies lawfully entered the home after obtaining Stanley and Richardson's consent.

---

*[footnote continued from previous page]*
human.'" (*People v. Barnes* (2013) 216 Cal.App.4th 1508, 1517, fn. 3, citing *Jardines,* at p. ____, 133 S.Ct. 1409, 1421.)

*F. Inevitable Discovery of The Evidence*

Evidence is not excluded "if it inevitably would have been obtained by lawful means in any event." (*People v. Boyer, supra*, 38 Cal.4th at p. 448.) Under the inevitable discovery doctrine, illegally seized evidence may be used where it would have been discovered by the police through lawful means. (*People v. Robles* (2000) 23 Cal.4th 789, 800-801.)

The California Supreme Court in *People v. Weiss* (1999) 20 Cal.4th 1073, 1079-1080, explained two findings are required to avoid the suppression of such evidence: (1) that after the unlawfully obtained information is excised from the affidavit, "probable cause remains to support the warrant; and [(2)] the officers would have sought the warrant without the illegally obtained information." (*Id.* at p. 1077.) The affidavit supporting the search warrant cannot contain information "derived from unlawful conduct as well as other, untainted, information." (*Id.* at p. 1078.)

Here Cantu had sufficient probable cause to believe the suspects of the armed robbery were in the Desert Air residence, and thus had ample probable cause to obtain a search warrant. Significantly, the timing of Cantu's observations of a dark-colored car with a loud exhaust system, the evasive driving, and finally the matching sets of two shoe impressions, connected the individuals inside the home with the robbery. A search warrant would have been obtained, and all the evidence would have been discovered in the residence even without a warrantless entry. Therefore, the motion to suppress would have been properly denied under this doctrine.

22

IV

SUFFICIENCY OF EVIDENCE FOR LASTER'S CONVICTIONS

Laster contends there is insufficient evidence he robbed Herring at gunpoint and made a criminal threat. We reject his claim.

In considering a claim of insufficiency of the evidence, a reviewing court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319; *People v. Marshall* (1997) 15 Cal.4th 1, 34; *People v. Stanley* (1995) 10 Cal.4th 764, 792-793; *People v. Johnson* (1980) 26 Cal.3d 557, 578; *People v. Cochran* (2002) 103 Cal.App.4th 8, 13.) The trier of fact is entitled to draw reasonable inferences from the evidence and a reviewing court should """"presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence."""" (*People v. Rayford* (1994) 9 Cal.4th 1, 23, quoting *Johnson,* at p. 576.) If the circumstances reasonably justify the trier of fact's findings, the reviewing court must affirm the judgment even though the circumstances might also be reasonably reconciled with a contrary finding. (*People v. Proctor* (1992) 4 Cal.4th 499, 529.)

The elements of robbery (§ 211) require proof that defendant took property with force or fear from another person's possession and immediate presence with intent to deprive the other person permanently of the property. (CALCRIM No. 1600.) A criminal threat (§ 422) requires proof that defendant willfully and unlawfully threatened to kill or cause great bodily injury to the victim, communicating to the victim a serious intention and the

23

immediate prospect that the threat would be carried out, causing the victim to be in sustained fear for his safety. (CALCRIM No. 1300.) An aider or abettor must aid and abet the perpetrator's commission of the crime. (CALCRIM No. 401.)

Herring testified he was confronted by two men in the carport and told not to move or his face would be blown off. Herring was ordered to relinquish his car keys and to lie on the ground. Herring complied because he thought the men were armed. Herring thought the men were African-American based on their accents. He heard them leave in a car with a loud exhaust system.

The robbers were seen speeding away from the robbery moments after it occurred. The same men were observed leaving the car and entering the Desert Air house. The officers saw the same two sets of shoe impressions at the scene of the crime and the residence where both defendants were found.

Laster was discovered hiding in the house where the officers found the victim's belongings concealed in the attic and other circumstantial evidence. While sitting in the patrol car, Laster or Richardson made a damning admission.

Even if Laster was not the one who threatened to blow Herring's head off, he is still culpable as an aider and abettor. (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409-410.) Both defendants were in the carport, participated in the robbery, and fled in the same car. Therefore, even if Richardson made the threat, it is reasonable to conclude Laster shared Richardson's specific intent. Sufficient evidence supported Laster's convictions.

24

THE $10,000 RESTITUTION FINES

Laster asserts the trial court abused its discretion when it ordered him to pay two $10,000 restitution fines.  (*People v. Giordano* (2007) 42 Cal.4th 644.)  Laster has forfeited his right to raise this issue on appeal by failing to object at his sentencing hearing.  (*People v. Bonilla* (2007) 41 Cal.4th 313, 336; *People v. Avila* (2009) 46 Cal.4th 680, 710-711; *People v. Nelson* (2011) 51 Cal.4th 198, 227.)  Regardless, Laster failed to meet his burden to demonstrate his inability to pay the restitution fines.  The same analysis applies to Richardson to the extent he joins in this argument.

The court has wide discretion in determining the amount of restitution to impose within the range authorized by statute.  (§ 1202.4, subd. (b)(1); *People v. Gangemi* (1993) 13 Cal.App.4th 1790, 1798; *People v. Urbano* (2005) 128 Cal.App.4th 396, 406.)  The exercise of discretion must not be disturbed on appeal except on a showing that the court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.  (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.)  Section 1202.4, subdivision (b) provides, "[i]n every case where a person is convicted of a crime, the court shall impose a separate and additional restitution fine, unless it finds compelling and extraordinary reasons for not doing so, and states those reasons on the record."  Section 1202.4, subdivision (b)(1), vests the court with broad discretion to set restitution fines, the highest amount being $10,000.  (§ 1204.4, subd. (b)(1).)

The court is also guided by section 1202.4, subdivision (d), which states,  "In setting the amount of the fine pursuant to subdivision (b) in excess of the minimum fine pursuant to

25

paragraph (1) of subdivision (b), the court shall consider any relevant factors, including, but not limited to, the defendant's inability to pay, the seriousness and gravity of the offense and the circumstances of its commission, any economic gain derived by the defendant as a result of the crime, the extent to which any other person suffered losses as a result of the crime, and the number of victims involved in the crime. Those losses may include pecuniary losses to the victim or his or her dependents as well as intangible losses, such as psychological harm caused by the crime. Consideration of a defendant's inability to pay may include his or her future earning capacity. A defendant shall bear the burden of demonstrating his or her inability to pay. Express findings by the court as to the factors bearing on the amount of the fine shall not be required. A separate hearing for the fine shall not be required."

The above statute provides the trial court with broad discretion to set restitution fines which are "commensurate with the seriousness of the offense." (*People v. Urbano, supra*, 128 Cal.App.4th at p. 405.) The trial court is not required to hold a hearing or state its findings on the record unless it declines to impose the fine. (§ 1202.4, subds. (b) & (d); *People v. Dickerson* (2004) 122 Cal.App.4th 1374, 1379-1380.) Furthermore, the trial court is required to impose a parole revocation fine if it has also imposed a fine under section 1202.4, and the amount must be equal to the section 1202.4 fine. (*People v. Rodriguez* (2000) 80 Cal.App.4th 372, 375-376.)

Defendants had the burden to show they could not pay the restitution fine. (*People v. Romero* (1996) 43 Cal.App.4th 440, 449; *People v. Avila, supra*, 46 Cal.4th at p. 729; and § 1202.4, subd. (d).) Nothing in the record demonstrates that Laster or Richardson did

26

not have an ability to pay the fine.  Absent such evidence, a trial court may presume a defendant has the ability to pay a restitution fine.  (*Romero*, at p. 449.)

Here the trial court duly considered the seriousness of defendants' crimes and their convictions for other numerous violent offenses.  (*People v. Urbano, supra*, 128 Cal.App.4th at p. 405; *People v. Griffin* (1987) 193 Cal.App.3d 739, 741)  Absent evidence supporting a defendant's inability to pay beyond the bare fact of his impending incarceration, and absent evidence indicating the trial court breached its duty to consider his ability to pay, no abuse of discretion will be found.  (*People v. Nelson, supra*, 51 Cal.4th at p. 227.)

## VI

## DISPOSITION

We hold the trial court did not err in denying defendants' motion to suppress or in imposing $10,000 fines on both defendants.  Sufficient evidence supported Laster's convictions.

We affirm the judgment.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

RAMIREZ
P. J.


HOLLENHORST
J.

27