Filed 3/23/16  In re B.R. CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re B.R. et al., Persons Coming Under the Juvenile Court Law. | B266858 (Los Angeles County Super. Ct. No. CK91568) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. F.R., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of the County of Los Angeles, Julie F. Blackshaw, Judge.  Affirmed.

Cristina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the County Counsel, Mary C. Wickham, County Counsel, Dawyn R. Harrison, Assistant County Counsel, Kim Nemoy, Principal Deputy County Counsel, for Plaintiff and Respondent.

F.R. (father) appeals from the juvenile court's order terminating his parental rights over his daughter B.R. (born June 2009), and son J.R. (born August 2010), under Welfare and Institutions Code section 366.26.[1] Father contends the juvenile court erred in failing to apply the parental visitation exception (under section 366.26, subdivision (c)(1)(B)(i)) to the termination of parental rights. We affirm the order.

## FACTUAL AND PROCEDURAL BACKGROUND

In January 2012, plaintiff and respondent Los Angeles County Department of Children and Family Services (Department) filed a petition on behalf of then 15-year-old J.E., nine-year-old J.M., five-year-old J.V., two-year-old B.R., and 17-month-old J.R,[2] pursuant to section 300, subdivisions (a), (b), (d) and (j). The petition alleged father: physically abused J.E. when the child intervened to protect the children's mother, R.M. (mother), from father's violence; sexually abused J.M. by forcibly raping her; and threatened to kill the child and mother if J.M. disclosed the sexual abuse. At a January 2012 detention hearing, the juvenile court found father to be the presumed father of B.R. and J.R.,[3] found the children were described by section 300, subdivisions (a), (b), (d) and (j); and ordered the children removed from their parents. B.R. and J.R. were detained together in a foster home.

The Department filed a January 26, 2012, detention report stating father had been arrested on numerous occasions since April 2000. The crimes for which he was arrested involved kidnapping, infliction of corporal punishment on a spouse, willful cruelty to a child, and battery. He was convicted, inter alia, in 2011 for infliction of corporal

---

[1]     All statutory references are to the Welfare and Institutions Code, unless otherwise indicated.

[2]     Only B.R. and J.R. are the subjects of this appeal.

[3]     The other three children had different biological (and presumed) fathers.

2

punishment under Penal Code section 273.5, subdivision (a), and in 2000 for battery under Penal Code section 242.

The Department filed a March 5, 2012, jurisdiction/disposition report stating father had a child welfare history. Specifically, in 2003, the juvenile court sustained allegations: father had disciplined his older male child (by a different mother) with a belt; his then 9-month-old son had been hospitalized due to being emaciated and neglected; and father's home was unsanitary. Father's family reunification services were terminated due to father's lack of housing and inconsistent participation in his individual counseling. In February 2011, there was an allegation of domestic violence between father and mother which was substantiated, but did not lead to a dependency case.

The March 5, 2012, report also stated father suffered from "mental retardation" and had been prescribed, but was not then taking, Lexapro. Father was scheduled to have visits with B.R. and J.R. every Monday for three hours, and his three hour monitored visit with them on February 27, 2012, occurred without incident. Mother too was scheduled to have monitored visits with the children.

At the April 2012 contested adjudication and disposition hearing, the juvenile court amended and sustained the petition, found the children were described by section 300, subdivisions (a), (b), (d) and (j), and declared the children dependants of the court. The court found, inter alia, mother and father engaged in domestic violence during which father was physically abusive towards mother and J.E., and father had sexually abused J.M.[4] The juvenile court declared the children dependents of the court; removed the children from their parents' custody; placed B.R. and J.R. in foster care; granted father monitored visits with B.R. and J.R.; and ordered father to participate in counseling that addressed parenting, sexual abuse, alcohol/drugs, and domestic violence.

The Department filed an October 18, 2012, status review report stating father was not complying with court orders. He refused to enroll in counseling for sexual offenders,

---

[4] Father challenged on appeal the juvenile court's jurisdiction and disposition orders. In our earlier unpublished opinion [*In re J.M.* (January 2, 2013, B240881 [nonpub. opn.])], we affirmed the orders.

3

denying he had done anything wrong. He also refused to participate in drug treatment, denying he took drugs. Although father claimed he completed an anger management program and was participating in individual counseling, he did not provide any verification. Father was visiting B.R. and J.R. on a weekly, monitored basis; he was appropriate with the children during the visits, and the children enjoyed their time with him.

By December 2012 father had enrolled in a program for sex offenders, but he continued to deny he sexually abused J.M. Father was also receiving services from the Regional Center for mild mental retardation and participating in parent education and domestic violence counseling. The Department filed a December 5, 2012, interim review report stating the children's caregiver said B.R. and J.R. enjoyed their visits with father and it "seem[ed] like [J.R.] was most connected to his father."

At the December 2012 review hearing, the juvenile court found father was in partial compliance with his case plan, and continued his reunification services and monitored visits of B.R. and J.R. The juvenile court liberalized mother's visits by allowing them to be unmonitored.

By March 2013, the Department reported B.R. and J.R. had been placed in the home of M.A. According to the Department's March 25, 2013, status review report, father was non-compliant and had not been in contact with the Department. M.A. stated father visited the children only twice between December 31, 2012, and March 13, 2013, and he did not call the children or inquire about how the children were doing. Also, there were concerns mother had resumed her relationship with father and gave him access to the children. At the May 2013 review hearing, the juvenile court terminated father's family reunification services, and liberalized mother's visits with the children to include overnight visits.

According to a June 12, 2013, addendum report filed by the Department, B.R. disclosed that during one of her visits with mother, father was at the home. Father became angry because B.R. was jumping on the bed. Father threw B.R. off the bed and onto the floor, and slapped mother on the face when she tried to intervene. Mother

4

denied father lived in her home or was around the children, but later admitted she had resumed a relationship with father and they would visit the children together. On June 12, 2013, the juvenile court reverted mother's visits back to monitored visits.

The Department's September 23, 2013, status review report stated the children were doing well in the home of M.A. and were bonded with her family. M.A. wanted to adopt the children if mother failed to reunify with them.

The Department reported M.A. stated father visited B.R. and J.R. occasionally, once every few weeks for one hour each time, usually on Sundays. M.A. again said father did not call the children or inquire about how the children were doing. Father saw the children "sporadically," but when he did visit them, he acted appropriately.

The Department filed a May 14, 2014, 366.26 WIC report stating father visited the children weekly (on Saturdays); the children were happy to see their father; father was comforting to and engaging with the children during the visits; and there were no reported incidents. The Department reported both children continued to do well in the home of M.A. M.A., and her live-in boyfriend of over 25 years, had been caring for B.R. and J.R. for over a year and a half during which time the children became securely attached to them. This was the children's third placement, and M.A. and her boyfriend loved them and wanted to provide them with a permanent home through adoption. An adoptive home study for M.A. and her boyfriend, on behalf of B.R. and J.R., was underway.

The Department stated in its July 16, 2014, addendum report that it supported the adoption of B.R. and J.R. by M.A. and her boyfriend, the children appeared to be "happy, safe and comfortable" in the home of the prospective adoptive parents," and the children were "appropriately attached" to them. The Department filed a July 16, 2014, status review report, stating the children continued to do well in their prospective adoptive home. B.R. was diagnosed with diabetes, and both children were receiving educational services. The parents continued weekly three-hour visits, and if father was not able to visit, he would call to make other arrangements.

The Department filed a November 19, 2014, addendum report stating B.R. had disruptive behaviors and was struggling in school. She received tutoring services and had a therapist who believed B.R. required intensive mental health services. On November 19, 2014, the Department filed a last minute information for the court report stating B.R. was hyperactive, defiant, had daily fights with her younger brother and wet the bed nightly. B.R. was diagnosed with adjustment disorder with mixed disturbance of emotion and conduct, enuresis and neglect.

The Department filed a January 8, 2015, status review report stating father usually visited the children weekly (on Saturdays), for approximately three hours. B.R. liked living with M.A., had a bond with her, and felt safe in her home. The Department reported the adoptive home study of M.A. and her boyfriend was approved in June 2015, and recommended the juvenile court terminate parental rights to free the children for adoption.

According to a September 14, 2015, status review report filed by the Department, the children continued to receive excellent care by M.A.; and the parents continued having weekly, three-hour visits. The Department filed an addendum report, dated September 14, 2015, stating the parents failed to visit for one month, from June 19 to July 19, 2015, and since then, father's visits became inconsistent and declined to one or two visits per month for an hour each in duration. The Department reported the children asked about father more than mother; and the prospective adoptive parents planned to continue parental visits after the adoption.

At the September 14, 2015, contested section 366.26 hearing, the juvenile court admitted into evidence various Department reports, and a September 2015 letter from Quality of Life Services, Inc. reporting that since 2009 father continued to receive parenting skills training, and for the prior six months had participated in "Mommy/Daddy and me" classes.

Father testified that before this dependency case began, the children resided with him and mother. During that time, father assumed "a lot" of the parental responsibilities, and the children called father "'Daddy.'"

Father said, since the commencement of the dependency case, he has visited the children every Sunday for about two hours. Father admitted, however, he was not always consistent with his weekly visits. This inconsistency was because sometimes he was too busy to visit the children, the caretaker's schedule precluded the visits, or his belief the caretaker would not be there for the visits. The caretaker never offered father make-up visits.

Father testified that during his visits, he talked to the children about school and their other programs, and sometimes assisted them with homework. When father left, the children cried, said they wanted to live with him, and asked when they could return home. The children sought him out for comfort, and during court hearings, they chose to sit with him instead of the caretaker.

Father stated neither child had issues at school, although father was aware B.R. occasionally had trouble sitting still and being attentive. Father was aware of B.R.'s diabetes, had spoken to the caretaker about it, but "[t]he only thing" father knew about B.R.'s diabetic condition was he could not give B.R. candy or other sugar products.

Father believed going forward with an adoption would be tragic and heart-breaking for the children because of their close relationship with him. He was not aware the caretakers were willing to continue his visits even if parental rights were terminated.

Father's counsel requested the juvenile court apply the parental visitation exception under section 366.26, subdivision (c)(1)(B)(i), and not terminate father's parental rights. Mother's counsel stated mother had previously withdrawn her request that the hearing be contested, was "happy with where the children are placed," and submitted the matter. The Department's counsel and the children's counsel requested the juvenile court terminate parental rights.

The juvenile court found B.R. and J.R. were adoptable, found the parental visitation exception to the termination of parental rights under section 366.26, subdivision (c)(1)(B)(i) did not apply, and terminated parental rights over B.R. and J.R. The juvenile court stated, "The court does find by clear and convincing evidence that the children are adoptable. And what the issue before the court is really whether the

7

father . . . has met his burden under 366.26, subdivision (c)(1)(B)(i) to show that there is such a significant emotional bond between the children and him such that . . . it would be detrimental to . . . them to . . . have his parental rights terminated. [¶] It is a high burden. Certainly the law's preference is for adoption because that is the most permanent preferable plan for the children, and that is what the court is obligated to do unless there is a compelling reason the termination of parental rights would be detrimental to the children. I do not find that it would be detrimental to the children here. [¶] The parents have maintained some contact with the children. The father's contact has been somewhat regular, but even father testified himself that sometimes he just . . . didn't go for visits not only because the caregiver wasn't there but because he just anticipated that maybe she, the caregivers, would not be there. [¶] In any event, I don't believe that he has met the first threshold for regular visitation. But even if that were met, I do not believe that the type of contact and bond that [father] has with the children is the type of parental bond that is envisioned under the law. [¶] He . . . is with them. They have a good time together. They talk about school. But [father] doesn't really play a parental role in their lives. His visits are once a week. They are monitored. [I] think the court can infer from his testimony that there is an incidental benefit to the children. And they enjoy the visits, but he does not play the type of significant parental role involved in their day-to-day life that would be required for the court to find the exception to apply. [¶] I think one thing that was very telling in father's testimony is his lack of understanding of [B.R.'s] diabetes issue. He knows she has issues but didn't really have any kind of understanding of exactly what that meant. And I think that shows the type of relationship is not parental, but it's just friendly. And so for that reason I will go forward with the termination of parental rights. [¶] I'll also notice that the children have had a very secure life with the caregivers for more than half of their lives. They are thriving in this relationship. So I think balancing the factors that I am required to balance, I do not find that father has met his burden."

DISCUSSION

## A.     Standard of Review

Whether the parental visitation exception to adoption "applies involves two component determinations:  a factual and a discretionary one.  The first determination—
. . . whether a beneficial parental . . . relationship exists . . .—is, because of its factual nature, properly reviewed for substantial evidence.  ([*In re Bailey J.* (2010)] 189 Cal.App.4th [1308,] 1314 [(*Bailey J.*)])  The second determination in the exception analysis is whether the existence of that relationship or other specified statutory circumstance constitutes 'a compelling reason for determining that termination would be detrimental to the child.'  (§ 366.26, subd. (c)(1)(B); see *Bailey J.*, at p. 1315.)  This '"quintessentially" discretionary decision, which calls for the juvenile court to determine the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption,' is appropriately reviewed under the deferential abuse of discretion standard. (*Bailey J.*, at p. 1315.)"[5]  (*In re K.P.* (2012) 203 Cal.App.4th 614, 622 (*K.P.*); *In re J.C.* (2014) 226 Cal.App.4th 503, 531.)

## B.     Applicable Law

"At a hearing under section 366.26, the court must select and implement a permanent plan for a dependent child.  Where there is no probability of reunification with a parent, adoption is the preferred permanent plan.  [Citation.]  To implement adoption as the permanent plan, the juvenile court must find, by clear and convincing evidence, that

---

[5]     Citing to cases that precede *Bailey J.*, *supra*, 189 Cal.App.4th 1308 by approximately ten years or more, father contends that the standard of review in an appeal challenging a juvenile court's finding that the beneficial parental relationship exception does not apply is whether substantial evidence supports the juvenile court's findings.  We disagree with father's contention regarding the applicable standard of review and instead follow the standard articulated in *Bailey J*.  We also note, "The practical differences between the [substantial evidence and abuse of discretion] standards of review are not significant."  (*In re Jasmine D*. (2000) 78 Cal.App.4th 1339, 1351.)

the minor is likely to be adopted if parental rights are terminated. [Citation.] Then, in the absence of evidence that termination of parental rights would be detrimental to the child under statutorily specified exceptions [citation], the juvenile court 'shall terminate parental rights' [citation]. [¶] Section 366.26 provides an exception to the general legislative preference for adoption when '[t]he court finds a compelling reason for determining that termination would be detrimental to the child' [citation] because '[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship [i.e., the parental visitation exception].' (§ 366.26, subd. (c)(1)(B)(i).)" (*K.P.*, *supra*, 203 Cal.App.4th at pp. 620-621.)

Parents bear the burden of establishing the visitation exception to termination of parental rights applies. (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 809 (*Zachary G.*).) Application of the parental visitation exception requires a two-prong analysis. (*In re Aaliyah R.* (2006) 136 Cal.App.4th 437, 449-450.) The first is whether there has been regular visitation and contact between parent and child. (*Id*. at p. 450.) The second is whether there is a sufficiently strong bond between parent and child that the child would suffer detriment from its termination. (*Ibid.*) The parent/child relationship must promote "the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H*. (1994) 27 Cal.App.4th 567, 575 (*Autumn H*.); *In re Dakota H*. (2005) 132 Cal.App.4th 212, 229.)

Whether the exception applies is determined "on a case-by-case basis, taking into account the many variables which affect a parent/child bond. The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the

10

variables which logically affect a parent/child bond." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.)

"'[B]ecause a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement.' [Citation.]" (*K.P.*, *supra*, 203 Cal.App.4th at p. 621.) It is the Legislature's "intent that adoption should be ordered unless exceptional circumstances exist, one of those exceptional circumstances being the existence of such a strong and beneficial parent-child relationship that terminating parental rights would be detrimental to the child and outweighs the child's need for a stable and permanent home that would come with adoption." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 51.)

### C.     Analysis

Under subdivision (c)(1)(B)(i) of section 366.26, a parent must show he or she "ha[s] maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." As previously noted, father bears the burden of establishing the parental visitation exception to the termination of parental rights applies. (*Zachary G., supra,* 77 Cal.App.4th at p. 809.)

Citing to authorities that a court of appeal can disregard and not develop an appellant's arguments not made in the opening brief, father contends the Department "implicitly conceded" father had regular contact with the children because it did not discuss that issue in its brief. In making this contention, father appears to argue we may not consider the issue. Father cites no authority supporting the proposition that a respondent implicitly concedes an issue by not discussing it in respondent's brief. By failing to do so, he has waived the claim. (*People v. Stanley* (1995) 10 Cal.4th 764, 793; *Nelson v. Avondale Homeowners Assn.* (2009) 172 Cal.App.4th 857, 862.) In any event, even if the respondent's brief could somehow be interpreted as a concession that father had regular contact with the children, we are under no obligation to accept the

11

concession. (See *People v. Thompson* (1990) 221 Cal.App.3d 923, 934.) No further discussion of this point is warranted.

Father has not shown he maintained consistent and regular contact with the children. Although there was evidence father generally maintained regular contact with the children, he concedes this was not always the case—he was not consistent with his weekly visits. Father testified he sometimes did not visit the children because he was too busy to do so, the caregiver was not home, or he merely anticipated the caregiver may be absent.

According to the Department's reports, M.A. stated father visited the children "sporadically." For example, father only visited the children twice between December 31, 2012, and March 13, 2013, and, during other time frames, father visited B.R. and J.R. only once every few weeks for just one hour. Father did not call the children or inquire about how the children were doing. The Department reported father failed to visit for one month, from June 19 to July 19, 2015, and since then, father's visits became inconsistent and declined to one or two visits per month for an hour each in duration.

There was also evidence that although father had a bond with B.R. and J.R., it was not the type of bond that would cause the children detriment if father's parental rights were terminated. To establish the beneficial parental relationship exception, "the parents must do more than demonstrate 'frequent and loving contact' [citation], an emotional bond with the child, or that the parents and child find their visits pleasant. [Citation.]" (*In re Andrea R*. (1999) 75 Cal.App.4th 1093, 1108.) A parent must show a benefit to the child from continuing the relationship would result. (*In re Mary G.* (2007) 151 Cal.App.4th 184, 207 (*Mary G.*); *In re Derek W*. (1999) 73 Cal.App.4th 823, 826-827.) "The parent must show he or she occupies a parental role in the child's life, resulting in a significant, positive, emotional attachment between child and parent. [Citations.]" (*Mary G.*, *supra*, 151 Cal.App.4th at p. 207; see *In re Helen W*. (2007) 150 Cal.App.4th 71, 80-81; *In re Beatrice M*. (1994) 29 Cal.App.4th 1411, 1416-1418.) "Interaction between natural parent and child will always confer some incidental benefit to the child. The significant attachment from child to parent results from the adult's attention to the

12

child's needs for physical care, nourishment, comfort, affection and stimulation. [Citation.]" (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

B.R. and J.R. were detained from their parents when B.R. was about two years old and J.R. was about 17 months old. Prior to being removed from the parent's custody, B.R. and J.R. had been exposed to physical abuse and domestic violence, and lived in a home where their sister was sexually abused by father.

Father does not occupy a parental role in the children's life. After the children were detained, father visited with the children once a week and those visits were monitored. It is undisputed that father's visits with the children never advanced from the three hours per week initially ordered by the juvenile court, or to an unmonitored setting. There is evidence father's understanding of B.R.'s diabetes was very limited; he knew she had diabetes, but did not have a substantial understanding of exactly what that meant—"[t]he only thing" father knew about B.R.'s diabetic condition was he could not give her candy or other sugar products.

By the time the juvenile court terminated father's parental rights, the children had lived outside parental custody for about three and one-half years and in the home of M.A. for about two and one-half years. The children's placement in the home of M.A. was their third placement.

M.A. loved the children and wanted to provide them with a permanent home through adoption. M.A.'s adoptive home study was ultimately approved, and the Department recommended the juvenile court terminate parental rights to free the children for adoption. There was evidence the children were doing well in the home of M.A. and her boyfriend, appeared to be "happy, safe and comfortable" in their home, were "appropriately attached" to them, and were bonded with their family. The juvenile court did not abuse its discretion by determining father's relationship with the children did not constitute a compelling reason for concluding termination of father's parental rights would be detrimental to the children.

13

**DISPOSITION**

The juvenile court's order is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


KUMAR, J.[*]


We concur:


TURNER, P. J.


BAKER, J.

---

[*]    Judge of the Superior Court of the County of Los Angeles, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.